UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


RACHEL DOUCETTE, et al.,      )
            )
       Plaintiffs,      )
   v.         )      CIVIL ACTION
            )      NO.  15-13193-JGD
CAROL JACOBS, et al.,       )
            )
      Defendants.    )


**MEMORANDUM OF DECISION AND ORDER ON**
**DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS**

January 17, 2018

DEIN, U.S.M.J.


## I.  INTRODUCTION

The plaintiffs, Rachel and Michael Doucette, are the parents of a severely disabled child,

B.D., who attended the Georgetown Public Schools ("GPS") from age three until he was able to

obtain an out-of-district placement at age six.  B.D. attended GPS under an Individualized

Education Plan ("IEP") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§

1400 *et seq.* ("IDEA") and the Massachusetts Special Education statute, Mass. Gen. Laws ch.

71B.  The Doucettes have brought this action individually and on behalf of their son, alleging

that B.D. suffered serious physical and emotional harm, including five stress-induced, life-

threatening, tonic-clonic seizures, due to the defendants' failure to provide him with

appropriate services in school, in violation of his federal and state law rights.  The seizures

allegedly stopped once B.D. was removed from the Georgetown schools, and the plaintiffs are

seeking monetary damages only against the entities and individuals involved in providing B.D. services while he was at GPS.[1]

In addition to asserting state law claims for intentional infliction of emotional distress (Count I), negligence (Count II), loss of consortium (Count III), and negligent infliction of emotional distress (Count VI),[2] in their Amended Complaint (Docket Nos. 20-2 at 6-15, and 20-3) ("Am. Compl."), the plaintiffs have alleged a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), against GPS, the School Committee, and the Town (Count IV), and a violation of 42 U.S.C. § 1983 against all defendants (Count V).  The Rehabilitation Act claim is based on the plaintiffs' contention that "[t]he defendants' refusal to permit B.D. access to his service dog in his educational setting was illegal disability-based discrimination that violated Section 504."  (Am. Compl. ¶ 104).  In support of their § 1983 claim, the plaintiffs challenge, inter alia, the defendants' failure to "evaluate[] the extent of B.D.'s visual impairment to determine the implication on his fine motor skills, education and related services" as well as the defendants' initial refusal to approve an in-district or out-of-district placement despite the inadequacies of the services available at GPS.  (See id. ¶¶ 111-15).  According to the plaintiffs, "[a]s a result of the defendants' deliberate indifference and severe, pervasive disregard for his

_____

[1] The defendants are the Town of Georgetown, Massachusetts (the "Town"); the Georgetown School Committee (the "School Committee"); GPS; Carol C. Jacobs, who was the Superintendent of GPS (the "Superintendent"); Margaret Maher, who was the Principal of the Perley Elementary School and Penn Brook Elementary School that B.D. attended (the "Principal"); Cathleen Estep, Ph.D., who was the Interim Special Education Director for GPS (the "Interim Special Education Director"); and Donna F. Straight, who was the Special Education Director for GPS (the "Special Education Director").  The parents have sued the Superintendent, Principal, Interim Special Education Director, and Special Education Director (collectively, the "individual defendants") in their official and individual capacities.

[2] The plaintiffs have voluntarily dismissed the claims of negligence and negligent infliction of emotional distress against the individual defendants.  (See Docket No. 51).

safety and well-being, B.D. was deprived of a free and appropriate education and was caused to suffer great physical and emotional harm."  (Id. ¶ 116).

This matter is presently before the court on "Defendants' Motion for Judgment on the Pleadings" (Docket No. 48) and "Defendants' Supplemental Motion for Judgment on the Pleadings" (Docket No. 61),[3] by which the defendants are seeking the dismissal of all claims asserted against them on the grounds (1) that the plaintiffs were required and failed to exhaust their administrative remedies under the IDEA before they could bring any of the claims asserted, (2) that the plaintiffs are not entitled to damages under the IDEA, (3) that the state tort claims against GPS, the School Committee and the Town are barred by the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, § 2, and (4) that the plaintiffs have failed to state a claim against the individual defendants for intentional infliction of emotional distress.

After consideration of the parties' written submissions, including their supplemental briefing, and the parties' oral arguments, and for all of the reasons described herein, this court finds that the plaintiffs' federal law claims must be dismissed for failure to exhaust administrative remedies under the IDEA.  This court declines to exercise jurisdiction over the remaining state claims.  See Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017) ("the Supreme Court has instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'") (quoting Carnegie-Mellon Univ. v. Cohill, 484

---

[3] The defendants' Supplemental Motion (Docket No. 61) expands on their argument that the plaintiffs are not entitled to compensatory damages.  Where convenient, the motions will be referred to collectively as a single motion for judgment on the pleadings.

U.S. 343, 350 n.7, 108 S. Ct. 614, 619 n.7, 98 L. Ed. 2d 720 (1988)).  Therefore, the defendants'

motions for judgment on the pleadings are ALLOWED, and the remaining state law claims will

be remanded to state court.

## II.  <u>STATEMENT OF FACTS</u>

As the defendants have filed an answer to the complaint, their motion before the court

is properly one for judgment on the pleadings, brought pursuant to Fed. R. Civ. P. 12(c).  <u>See</u>

<u>Aponte-Torres v. Univ. of P.R.</u>, 445 F.3d 50, 54 (1st Cir. 2006).  "A motion under Fed. R. Civ. P.

12(c) for judgment on the pleadings is treated like a Rule 12(b)(6) motion to dismiss."  <u>Diaz-

Nieves v. United States</u>, 858 F.3d 678, 689 (1st Cir. 2017) (citing <u>Curran v. Cousins</u>, 509 F.3d 36,

43–44 (1st Cir. 2007)).  "Accordingly, 'the court must view the facts contained in the pleadings

in the light most favorable to the nonmovant and draw all reasonable inferences therefrom.'"

<u>Id.</u> (quoting <u>Pérez–Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008)).  Dismissal on the

pleadings is appropriate "if it appears that the nonmovant could prove no set of facts that

would entitle him or her to relief."  <u>Id.</u> (citing <u>Mass. Nurses Ass'n v. N. Adams Reg'l Hosp.</u>, 467

F.3d 27, 31 (1st Cir. 2006)) (additional citation omitted).

Applying these principles, the relevant facts are as follows.

## B.D. and His IEP

B.D. has Isodicentric Chromosome 15q Duplication Syndrome, a rare de novo genetic

disorder.  (<u>See</u> Am. Compl. ¶ 15).  As described in the Amended Complaint:

> As a consequence of this syndrome, B.D. has a number of substantial educational
> limitations, including global developmental delay, with a diagnosis of Pervasive
> Developmental Disability, Not Otherwise Specified (PDD, NOS), autistic spectrum
> disorder, seizure disorder, anxiety disorder, sleep disorder and gastrointestinal
> issues.  B.D. also has been diagnosed with attention-deficit hyperactivity disorder
> (ADHD), a history of choking, low muscle tone and balance defects, together with

a high threshold for pain, limited ability to report injury or discomfort, sensory process disorder, visual problems, decreased personal safety awareness, maladaptive behaviors such as bolting and aggression, cognitive impairment, and communication deficits.

(Id.).  Furthermore, of significance to the issues before this court, "[c]hildren with Chromosome 15q Duplication Syndrome have an increased risk of sudden unexpected death (SUD)" caused by respiratory or cardiac arrest.  (Id. ¶ 16).  The plaintiffs contend that this increased risk "is typically correlated with seizure activity[,]" as a result of which "the prevention of seizures in such children is of critical importance."  (Id.).

In July 2009, when he was almost three years old, B.D. began attending Perley Elementary School ("Perley") in Georgetown.  (Id. ¶ 19).  At Perley, B.D. received special education and related services provided by GPS under an IEP developed pursuant to the IDEA and the Massachusetts Special Education statute, Mass. Gen. Laws ch. 71B.  (Id.).  "Pursuant to his IEP, B.D. received individual instruction, occupational therapy, physical therapy, speech-language services both within and outside the classroom, home training by an aide, and . . . a 1:1 aide trained in CPR and Heimlich maneuvers because of a risk of choking and a risk of bolting."  (Id.).  Also pursuant to his IEP, B.D. attended school both during the regular school year and over the summer as part of an "Extended School Year" ("ESY") program.  (Id.).

B.D.'s parents were not satisfied with the services that B.D. was receiving at GPS.  For example, but without limitation, as early as October 2009, three months after B.D. began attending Perley, B.D.'s parents expressed concerns to GPS, its administrators, educators and staff, based on Mrs. Doucette's personal observations, "that B.D. was not receiving the educational programming and services required under his IEP and these failures were placing his safety and well-being at risk."  (Id. ¶ 20).  When B.D. was diagnosed with an anxiety disorder

and a seizure disorder in December 2009, B.D.'s parents requested that his IEP be amended to include a Seizure Plan. (Id. ¶¶ 22-23). While the Seizure Plan was eventually added, according to B.D.'s parents, the appropriate personnel were never properly trained, and the Plan was not appropriately followed. (Id. ¶¶ 31-34).

From January to early March 2010, B.D.'s parents had B.D. evaluated by a number of medical specialists who recommended that an educational program that utilized, to a substantial degree, applied behavior analysis (ABA) methodology, including structured sensory breaks and discrete trials, be added to B.D.'s IEP. (Id. ¶ 25). On March 29, 2010, B.D.'s parents complained at an IEP team meeting at which the Superintendent and the Principal were in attendance, that B.D.'s placement at GPS was inappropriate because B.D. was not making educational progress and his developmental delays were increasing. (Id. ¶ 26). They also argued that B.D. should be immediately placed in an in-district or out-of-district placement that incorporated ABA methodologies. (Id.). Members of B.D.'s IEP team "disagreed that B.D. was not making educational progress, that he needed structured sensory breaks, or that GPS was an inappropriate placement." (Id.).

After the March 2010 IEP team meeting, B.D.'s parents continued to complain verbally and in emails to GPS, its administrators, educators and staff, that B.D.'s safety and well-being were at risk because the school "was not implementing the kinds of interventions he needed to learn, that his aides were not appropriately trained, that he was not receiving sufficient sensory therapies, that he was not being monitored closely and was bolting from class, that he was becoming more aggressive toward other students, and that, after falling and hitting his head, his medical condition and disability were not taken into consideration and he was not provided

proper care." (Id. ¶ 27). As a result of these concerns, on May 10, 2010, B.D.'s parents

removed B.D. from Perley, and B.D. remained out of school until September 2, 2010. (Id.).

### The 2010 BSEA Hearing

On July 12, 2010, B.D.'s parents filed a Request for Hearing with the Massachusetts

Bureau of Special Education Appeals ("BSEA"), seeking an out-of-district placement for B.D. for

the 2010-2011 school year on the basis that GPS's proposed IEP was inappropriate. (Id. ¶ 28).

B.D.'s parents also sought compensatory services for the time B.D. had been out of school.

(Id.).

After conducting hearings in late August 2010, the BSEA hearing officer found that B.D.'s

proposed IEP "was not appropriate and not reasonably calculated to provide B.D. with a free

and appropriate public education ("FAPE") in the least restrictive environment[.]" (Id. ¶ 29).

Nevertheless, the hearing officer found that GPS was an appropriate placement because "GPS

could amend the IEP to make it appropriate through additions and modifications," and because

GPS "had the capacity to develop an appropriate ABA-based substantially-separate classroom

placement for B.D. at the start of the 2010-2011 school year." (Id.). Plaintiffs allege that based

on the BSEA decision and on explicit assurances from GPS "that it would develop an ABA-based,

substantially separate Transition classroom that would be ready for the September 2010 start

of school, and that an Individual Student Safety Plan and Seizure Plan would be integrated in his

IEP," they allowed B.D. to return to Perley in September 2010. (Id. ¶ 30). As detailed below,

the plaintiffs were of the opinion that the defendants never fulfilled their obligations under the

IEP or provided the services that B.D. needed and to which he was entitled. However, they

never filed any additional administrative claims.

**B.D.'s Service Dog**

B.D.'s seizure activity increased after he returned to school. (Id. ¶¶ 31-32). B.D.'s parents allege that despite assurances to the contrary, the defendants were not prepared to handle B.D.'s seizure activity appropriately. (Id. ¶ 32). As a result, B.D. was inappropriately sent home on occasion. (Id. ¶ 33). This caused B.D. to lose educational and developmental opportunities and to suffer a disruption in his schedules and routines. (Id. ¶¶ 32-33).

In September 2011, B.D. began attending Kindergarten at Perley. (Id. ¶ 34). Shortly thereafter, in or about November 2011, B.D. privately received a specially trained and certified service dog that provided "autism assistance service, facilitated guide, search and rescue, and assistance with behavior disruption, anxiety, balance and seizure alerting, all of which were of benefit to B.D." (Id. ¶ 35). B.D.'s parents allege that "[t]he service dog permitted B.D. to develop some independence and confidence and helped him bridge social barriers" and that "B.D.'s behavior in social situations improved when his service dog was present." (Id. ¶ 36). Nevertheless, B.D. was not permitted to bring his service dog to school. (Id. ¶ 37). This denial constitutes the basis of the plaintiffs' Rehabilitation Act claim.

In or about the spring of 2012, B.D. began exhibiting increased anxiety, staring, and inattention, and the Principal and B.D.'s mother discussed whether the use of B.D.'s service dog in school would help with B.D.'s anxiety. (Id. ¶ 39). However, the plaintiffs allege that the School Committee and Superintendent "blocked B.D.'s access to his service dog." (Id.). Specifically, B.D.'s parents allege that "[i]n order for B.D. to have access to his service dog with GPS as the handler, [B.D.'s parents] were requested to sign and agree to a School Committee approved policy that was in violation of the Americans with Disabilities Act (ADA)." (Id.). B.D.'s

parents allegedly declined to sign and agree to the policy. (Id.). B.D.'s parents also allege that the Superintendent "directed the performance of a Functional Behavior Assessment (FBA) to determine whether B.D. required the use of a service dog as an accommodation and to determine whether the IEP would be amended to include a service dog as an accommodation. The FBA data was to be collected in a trial period to take place during the academic school year, not during ESY and with B.D.'s mother present as the [dog's] handler." (Id.). No further details regarding this FBA are provided.

### The 2012 ESY Program and B.D.'s Seizures

The 2012 ESY program was held at Penn Brook Elementary School ("Penn Brook") as opposed to its previous location at B.D.'s school, Perley. (Id. ¶ 43). As represented by the parties at oral argument, the location change was due to necessary repairs at Perley. B.D.'s parents were very upset by the location change, and were very concerned that Penn Brook would not be a safe facility for B.D. and that GPS would not be able to implement B.D.'s IEP appropriately there. (Id. ¶¶ 45-46). In their view, the defendants never lived up to their assurances that the ESY program would be ready and appropriate for B.D. (Id. ¶¶ 46-47).

Plaintiffs allege that from the start of the 2012 ESY program, GPS failed to appropriately implement B.D.'s IEP. (Id. ¶¶ 46-48). For example, B.D.'s parents allege that pursuant to his IEP in effect at that time, B.D. was to have:

> limited environmental stimuli, special consideration for his sensory processing needs in any larger group environment, a "quiet area" such as a "tent and/or pillow area" for "quiet time," picture schedule, picture supports such as a choice board, first/then board, mini schedules, "consistent routine," transition cues, preferential seating for sensory needs, a slant board, supported seating that provided 90/90/90 degree angles (Rifton chair), discrete trials, preparation "for planned changes in staffing/schedule," [and] structured sensory breaks[.]

(Id. ¶ 47).  Nevertheless, "many of these accommodations were not provided."  (Id.).[4]  Instead, B.D. was faced with an unfamiliar setting and improperly trained staff who failed to follow his IEP, and he was placed with unfamiliar students.  (Id. ¶¶ 48-49).  As alleged, "[t]hese drastic changes were overwhelming for B.D., then six (6) years old and suffering from an anxiety disorder, visual impairment, sensory process disorder and autistic spectrum disorder."  (Id. ¶ 50).  The problem was exacerbated by the fact that "B.D. was not permitted to be accompanied by his service dog, with whom he had been working since 2011, and who could have helped him visually comprehend this new environment and minimize the stress from his new environment."  (Id.).

On July 5, 2012, while at ESY at Penn Brook, B.D. experienced a tonic-clonic seizure, which lasted over twenty minutes and required the administration of Diastat gel.  (Id. ¶ 51).  911 was called and B.D. was transported by ambulance to Lawrence General Hospital.  (Id.).  As a result of this seizure, B.D.'s doctor prescribed Keppra in addition to his other medications.  (Id.).

On July 6, 2012, B.D.'s parents "demanded that B.D.'s IEP be amended and that his service dog be added as an accommodation effective immediately."  (Id. ¶ 52).  GPS and the School Committee "denied the Parents' request and refused to amend B.D.'s IEP to include a service dog as an accommodation."  (Id.).  However, they allowed B.D. to bring his service dog to school with his mother as the dog's handler, on a trial basis beginning on or about July 10, 2012.  (Id.).

---

[4] While many facts about the sufficiency of the services provided are in dispute, the defendants admit that there was a delay in providing B.D. with his original slant board and Rifton chair.  (Defs. Answer (Docket No. 21) ¶ 48).

B.D.'s parents continued to express their concern that B.D.'s aide/special education teacher was not appropriately trained, and that "the constant program changes and inconsistencies in how his IEP was being implemented" contributed to increased aggressive behavior and anxiety on the part of B.D. (Id. ¶¶ 53-54). However, nothing improved. (Id. ¶ 54). On July 18, 2012, while attending the ESY program, B.D. suffered a second tonic-clonic seizure "reported as two (2) separate seizures, one lasting forty-five (45) seconds and a second lasting twenty-five (25) minutes, and require[ing] the administration of Diastat gel." (Id. ¶ 55). 911 was called and B.D. was transported to Massachusetts General Hospital ("MGH"). (Id.). B.D.'s doctor adjusted his medications. (Id.).

On July 26, 2012, one of B.D.'s doctors noted that B.D. had "regressed a bit in his development over the summer with less academic support" and that his gastrointestinal issues had worsened. (Id. ¶ 57). On July 30, 2012, B.D.'s parents met with the Special Education Director, the Principal, and the Superintendent and took the position that B.D.'s "continued placement at GPS was inappropriate, that B.D. was at risk [there], and that GPS had failed to take actions to effectively mitigate those risks." (Id. ¶ 58). B.D.'s parents allege that "GPS continued to refuse to consider the continuum of educational placements for B.D. as required under his IEP." (Id.).

On July 31, 2012, while attending his ESY program, B.D. suffered a third tonic-clonic seizure which lasted approximately eight minutes and required the administration of Diastat gel. (Id. ¶ 59). 911 was called and B.D. was transported to Lawrence General Hospital. (Id.).

Then, on August 6, 2012, while attending his ESY program, B.D. suffered a fourth tonic-clonic seizure which lasted approximately eleven minutes and required the administration of

Diastat gel.  (Id. ¶ 60).  911 was called and B.D. was transported to MGH.  (Id.).  On that same

day, B.D.'s mother communicated to the Superintendent, the Principal, and the Special

Education Director that "the most probable cause for B.D.'s extraordinary increase in seizure

activity over the past month" was GPS's "extremely poor and ineffective" implementation of

B.D.'s IEP and GPS's "unacceptable" "lack of planning, training and execution [of his IEP]."  (Id. ¶

61).  B.D.'s mother also expressed her concern that B.D.'s ESY placement was not only

inappropriate, but was also unsafe.  (Id.).  B.D.'s parents would no longer "subject their son to

unsafe, unhealthy and life threatening situations at GPS, and wanted answers as to GPS's

proposed plan to implement the agreed upon services and education in a safe and appropriate

learning environment."  (Id.).  B.D.'s parents then removed B.D. from GPS.  (Id. ¶ 62).

On August 13, 2012, the Superintendent advised B.D.'s mother that "her questions

needed to be answered by 'the team'" and that "input from medical personnel should also be

considered."  (Id. ¶ 63).  The Superintendent also advised that she would work with the

Principal and the Special Education Director to determine if GPS would offer compensatory

services, and stated that she believed that GPS could provide "the program detailed in his IEP

beginning in September without an out-of-school placement."  (Id. ¶ 63).  Despite input from

B.D.'s doctor recommending that B.D. be removed from his current classroom setting, and kept

out of school until an appropriate placement was located, on August 30, 2012, the Special

Education Director advised B.D.'s parents that B.D.'s placement would remain at GPS, that GPS

was expecting B.D. to attend the start of school on September 5, 2012, and that any "extended

absences will be considered truancy."  (Id. ¶¶ 64-65).

Shortly after arriving at Perley for the first day of school on September 5, 2012, B.D. suffered a fifth tonic-clonic seizure, which lasted approximately four minutes before the administration of Diastat gel. (Id. ¶ 66). 911 was called and B.D. was transported unresponsive to MGH. (Id.). After B.D. suffered the fifth tonic-clonic seizure, his parents rescinded his educational placement at GPS. (Id. ¶ 67). He has not returned to the Georgetown schools since then.

### B.D.'s Eye Examinations

In addition to defendants' refusal to allow B.D. to have his service dog, the plaintiffs further challenge the defendants' treatment of his visual impairment as being in violation of his constitutional rights. On March 23, 2012, B.D.'s parents had taken him to his pediatric ophthalmologist because he had failed a school vision screening. (Id. ¶ 41). B.D.'s doctor found B.D. to have depth perception issues and recommended that B.D. be evaluated by a Developmental Optometrist. (Id.). B.D.'s parents then requested that GPS pay for the recommended evaluation, but "their request was denied." (Id.). B.D.'s parents further allege that they "continued to request that B.D. be evaluated by a Developmental Optometrist" but "the request was declined by GPS" until July 6, 2012, the day after B.D.'s first tonic-clonic seizure at GPS. (Id.). On that day, GPS informed the parents that GPS would pay for B.D. to be evaluated by an optometrist. (Id.).

On or about July 19, 2012, B.D. was evaluated, at GPS's expense, by an optometrist, Dr. Robin S. Blair, who found his "vision performance 'unskilled,' his focusing ability 'passable,' and his eye teaming ability 'unskilled,'" recommended further testing, and referred B.D. to a practitioner who specialized in behavioral and developmental optometric vision care. (Id. ¶

56).  B.D.'s parents allege that the Special Education Director "denied the recommended further evaluation[,]" advising B.D.'s mother that GPS had "only agreed to the initial eye exam." (Id.).  These facts form the basis of plaintiffs' allegation that GPS violated the IDEA's "child find" provision[5] by failing to appropriately identify and evaluate B.D.'s visual impairment.  (See id. ¶¶ 111-13).

### Out-of-District Placement and Subsequent Health Issues

In November 2012, GPS and the School Committee agreed to place B.D. in an extended evaluation in an out-of-district placement, and, after the evaluation period, agreed to an out-of-district placement.  (Id. ¶¶ 67, 69-70).  As of the filing of the amended complaint in this matter, B.D. has remained in an out-of-district placement.  (Id. ¶ 75).

In April 2013, B.D. was diagnosed with Cerebral Visual Impairment.  (Id. ¶ 72).  On March 19, 2014, B.D. was admitted overnight to the Acute Psychiatric Services department at MGH due to "increased aggression, paranoia and hallucinations."  (Id. ¶ 73).  From May 9, 2014 until July 31, 2014, B.D. was hospitalized at Hampstead Hospital for severe aggression and hallucinations and was diagnosed with "Disruptive Behavior Disorder NOS and Psychotic Disorder NOS."  (Id. ¶ 74).

According to the plaintiffs, B.D. has been attending Berkshire Meadows in Great Barrington, Massachusetts, since July 2014, "through his IEP" and "making developmental and

---

[5] The IDEA's "child find" provision states: "All children with disabilities residing in the State, … regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services." CBDE Public Schs. v. Mass. Bureau of Special Educ. Appeals, Civil Action Nos. 11-10874-DPW, 2012 WL 4482296, at *2 n.5 (D. Mass. Sept. 27, 2012) (quoting 20 U.S.C. § 1412(a)(3) and citing 34 C.F.R. § 300.11(a)(1)(i)).

educational progress." (Id. ¶ 75).  Plaintiffs allege that B.D. has not suffered a seizure since

being removed from GPS.  (Id. ¶ 76).

Additional facts relevant to this court's analysis are described below where appropriate.

### III.  ANALYSIS

#### A.  Standard of Review

As detailed above, a motion for judgment on the pleadings is analyzed under

substantially the same standard as a motion to dismiss.  Therefore, the court accepts as true all

well-pleaded facts and draws all reasonable inferences in favor of the plaintiffs.  Cooperman v.

Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).  To survive a motion to dismiss, the complaint

"must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."

Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678,

129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)) (additional quotation and citation omitted).

"The plausibility inquiry necessitates a two-step pavane."  Garcia-Catalan v. United

States, 734 F.3d 100, 103 (1st Cir. 2013). "First, the court must distinguish 'the complaint's

factual allegations (which must be accepted as true) from its conclusory legal allegations (which

need not be credited).'"  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir.

2012)).  "Second, the court must determine whether the factual allegations are sufficient to

support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id.

(quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted).

This second step requires the reviewing court to "draw on its judicial experience and common

sense."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950).  "If the factual

allegations in the complaint are too meager, vague, or conclusory to remove the possibility of

relief from the realm of mere conjecture, the complaint is open to dismissal." Morales-Cruz, 676 F.3d at 224 (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)).

Applying these principles to the instant case compels the conclusion that the defendants' motion for judgment on the pleadings must be allowed, as the plaintiffs have failed to exhaust their federal law claims.

## B. **Statutory Framework**

The IDEA "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education' – more concisely known as a FAPE – to all children with certain physical or intellectual disabilities." Fry v. Napoleon Community Schs., --- U.S. ---, 137 S. Ct. 743, 748, 197 L. Ed. 2d 46 (2017) (citing 20 U.S.C. §§ 1412(a)(1)(A) and 1401(3)(A)(i)). "[A] FAPE comprises 'special education and related services' – both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." Id. at 748-49 (quoting 20 U.S.C. §§ 1401(9), (26), (29)) (additional citations omitted). "The FAPE required by the IDEA is tailored to the needs of a disabled child through the creation and implementation of an 'individualized educational program' ("IEP")." S.S. by S.Y. v. City of Springfield, Mass., 146 F. Supp. 3d 414, 417 (D. Mass. 2015) (citing Bd. of Educ. of Hendrick Hudson Central Sch. Dist. of Westchester Cty. v. Rowley, 458 U.S. 176, 181-82, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)). "An extensive set of procedural safeguards grant parents or guardians the right to participate in the meetings that lead to the development of the IEP and give them a mechanism to challenge the IEP before an impartial 'state educational agency.'" Id. at 418 (citing Rowley, 458 U.S. at 182-83, 102 S. Ct. at 3039) (additional citation omitted). "The scope of the due process hearing is broad, encompassing 'complaints with respect to any

matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.'" <u>Rose v. Yeaw</u>, 214 F.3d 206, 210 (1st Cir. 2000) (quoting 20 U.S.C. § 1415(b)(6)).  In Massachusetts, the "state educational agency" tasked with conducting an impartial due process hearing regarding such a complaint is the Bureau of Special Education Appeals ("BSEA").  <u>S.S. by S.Y.</u>, 146 F. Supp. 3d at 418 (citing <u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 58-59 (1st Cir. 2002)) (additional citation omitted).

A party "who proceeds through the state administrative procedure and is 'aggrieved by the findings and decision' of the independent hearing officer . . . can bring a civil action in federal court." <u>Id.</u> (citing 20 U.S.C. § 1415(i)(2)).  However, a party who fails to exhaust the administrative review process set forth in the IDEA "is foreclosed from pursuing their IDEA claim in federal court." <u>Id.</u>

### What Types of Claims Need to be Exhausted

At issue in this motion for judgment on the pleadings is whether the plaintiffs needed to exhaust the administrative review process with respect to their claims under the Rehabilitation Act or 42 U.S.C. § 1983 before they could maintain the instant action.[6]  In the recent case of <u>Fry v. Napoleon Community Schs.</u>, 137 S. Ct. 743 (2017), the United States Supreme Court clarified the scope of the IDEA's exhaustion requirement.  As the Court held:

> [the IDEA] ensures that children with disabilities receive needed special education services.  One of its provisions, § 1415(l), addresses the Act's relationship with other laws protecting those children.  Section 1415(l) makes clear that nothing in the IDEA "restrict[s] or limit[s] the rights [or] remedies" that other federal laws, including antidiscrimination statutes, confer on children with disabilities.  At the

---

[6] This court expresses no opinion as to whether the state law claims need to be exhausted before suit can be brought.  The parties disagree as to this issue.

same time, the section states that if a suit brought under such a law "seek[s] relief that is also available under" the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures.

Id. at 748.  The Supreme Court explained that "exhaustion is not necessary when the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee – what the Act calls a 'free appropriate public education.'"  Id. (citing § 1412(a)(1)(A)).  However, "[i]f a lawsuit charges such a denial, the plaintiff cannot escape § 1415(l) merely by bringing her suit under a statute other than the IDEA."  Id. at 754.

The Court further held that "in determining whether a suit indeed 'seeks' relief for such a denial [of a FAPE], a court should look to the substance, or gravamen, of the plaintiff's complaint."  Id. at 752.  The labeling of the complaint is not dispositive.  Id. at 755.  The Court offered a pair of hypothetical questions designed to provide "clue[s]" as "to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination."  Id. at 756.  These are (1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school – say, a public theater or library?" and (2) "could an adult at the school – say, an employee or visitor – have pressed essentially the same grievance?"  Id. (emphasis omitted).  If the answers to the two questions are "yes," the Court explained, "a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject" because "in those other situations there is no FAPE obligation and yet the same basic suit could go forward."  Id.  If one or both of the answers is "no," then "the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why

only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim." Id.

The Court provided another piece of guidance regarding how to determine whether the gravamen of a complaint concerns the denial of a FAPE: "[a] further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings. In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream." Id. at 757. The Court explained that a plaintiff's initial choice to pursue the administrative process "before switching midstream . . . may suggest that she is indeed seeking relief for the denial of a FAPE – with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy." Id. "Whether that is so depends on the facts; a court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely." Id. "But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." Id.

Applying these principles to the instant case, this court concludes that the gravamen of the Doucettes' federal claims are for the denial of a FAPE, and, therefore, that they had to exhaust their administrative remedies. Their failure to do so mandates that their federal claims be dismissed.

### C. **Exhaustion of the Federal Claims was Required**

Defendants argue that this court must enter judgment in their favor on plaintiffs' Rehabilitation Act and Section 1983 claims on the basis that plaintiffs were required, but failed, to exhaust their administrative remedies under the IDEA. Plaintiffs argue that the IDEA's exhaustion requirement does not apply to their claims, and, in the alternative, that they should be excused from complying with the exhaustion requirement on the grounds of futility and undue burden. For the reasons set forth below, this court finds that plaintiffs were required to exhaust their administrative remedies under the IDEA with respect to their Rehabilitation Act and Section 1983 claims, and are not excused from doing so.

## Rehabilitation Act

Plaintiffs claim that the defendants' "refusal to permit B.D. access to his service dog in his educational setting" constituted a violation of Section 504 of the Rehabilitation Act. (Am. Compl. ¶ 104). They argue that by that claim, they are not alleging the denial of a FAPE, but are only alleging discrimination on the basis of B.D.'s disability. (See Pl. Suppl. Opp. (Docket No. 66) at 4). This argument is not persuasive.

To determine whether plaintiffs seek relief under the IDEA, the court must evaluate the "gravamen" of the complaint. Fry, 137 S. Ct. at 752. As the facts detailed above establish, there can be no question that the plaintiffs' entire complaint is premised on their contention that the defendants failed to provide an adequate IEP, failed to provide the services they agreed to provide under an IEP, and failed to address B.D.'s physical and psychological needs. Applying the hypothetical suggested by the Fry court, these are not grievances that an adult at the school, such as an employee or visitor, could have pressed. See id. at 756. Rather, the entire complaint is based on B.D.'s IEP, B.D.'s parents' concern that B.D. was not receiving

appropriate services in his public education, and their contention that the lack of such services was causing B.D. serious harm.

As further evidence that the plaintiffs' claims relate to the denial of a FAPE, the plaintiffs "previously invoked the IDEA's formal procedures to handle the dispute[.]" Id. at 757. Even the resolution of the plaintiffs' issues with GPS – an out-of-district placement for B.D. – was done under the auspices of an IEP. (See Am. Compl. ¶ 75). It is impossible to conclude other than the essence of the Amended Complaint is the denial of a FAPE to B.D.

The plaintiffs attempt to segregate out the request that B.D. be allowed to bring his service dog with him to school as being distinct from his IEP. This argument is defeated by the allegations of the complaint, as well as logic. Plaintiffs specifically allege that they "demanded that B.D.'s IEP be amended and that his service dog be added as an accommodation" and that the defendants "denied the Parents' request and refused to amend B.D.'s IEP to include a service dog as an accommodation." (Id. ¶ 52; see also id. ¶ 39 (school considers a Functional Behavior Assessment "to determine whether the IEP would be amended to include a service dog as an accommodation.")). The plaintiffs' claims relating to the denial of B.D.'s use of service dog are part and parcel of their contentions about the failure of the defendants to provide a FAPE.

Moreover, the demand for the use of the service dog is the type of complaint that could appropriately be raised before the BSEA in connection with a challenge to an IEP. See Rose, 214 F.3d at 209 ("any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education" may be brought before the BSEA); see also Am. Compl. ¶ 29 (dispute over whether B.D. was entitled to ABA therapies as

part of his IEP was resolved by the BSEA in 2010).  In sum, plaintiffs' Rehabilitation Act claim is in essence a claim under the IDEA.  Unless excused, the plaintiffs were obligated to exhaust their administrative remedies.  See Weber v. Cranston Sch. Comm., 212 F.3d 41, 51-52 (1st Cir. 2000) (requiring exhaustion for § 504 claims that fall under the scope of the IDEA).

### Section 1983

Defendants also argue that they are entitled to judgment in their favor on plaintiffs' Section 1983 claim because this claim is essentially an unexhausted IDEA claim.  (See Defs. Mem. (Docket No. 49) at 6; Defs. Suppl. Mem. (Docket No. 62) at 2-4).  Plaintiffs argue that the IDEA does not preclude them from recovering under Section 1983, and in the alternative, that they should be excused from exhausting their administrative remedies under the IDEA.  For the reasons provided below, this court disagrees.

To state a claim under 42 U.S.C. § 1983, "a plaintiff first must identify an act or omission undertaken under color of state law" and then "must allege what is colloquially known as 'constitutional injury,' that is, he or she must identify a deprivation of some federally secured right."  Aponte-Torres, 445 F.3d at 55 (internal quotations and citations omitted).  In their Amended Complaint, plaintiffs allege that their 1983 claim is premised on violations of the rights protected by "Procedural Due Process under the Fourteenth Amendment to the United States Constitution, the Equal Protection Clause under the Fourteenth Amendment to the United State[s] Constitution, and rights secured by IDEA, its regulations and Section 504."  (Am. Compl. ¶ 108).  In their pleadings in opposition to the present motion, the plaintiffs do not address procedural due process or the equal protection clause, and those claims are deemed waived.  Vysedskiy v. OnShift, Inc., No. CV 16-12161-MLW, 2017 WL 4391725, at *4, n.2 (D.

Mass. Sept. 29, 2017) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (where

plaintiff did not argue or develop legal theory alluded to in complaint in connection with a

motion to dismiss, theory deemed waived)).  Rather, they describe their Section 1983 claim as

being "for the defendants' deliberate indifference and severe, pervasive disregard for B.D.'s

safety and well-being[.]"  (See Pls. Opp. (Docket No. 57) at 15; Pls. Supp. Opp. (Docket No. 66)

at 5).  This court assumes that the plaintiffs are asserting a substantive due process claim.  See

also Pollard, 132 F. Supp. 3d 208, 227 (D. Mass. 2015) ("To establish a substantive due process

claim, a plaintiff 'must show . . . that the acts were so egregious as to shock the conscience' and

'that they deprived him of a protected interest in life, liberty, or property.'") (quoting Pagan v.

Calderon, 448 F.3d 16, 32 (1st Cir. 2006)).  In any event, all of these claims must be dismissed.

It is well-established that "Section 1983 cannot be used as a vehicle for ADA or other

statutory claims that provide their own frameworks for damages."  M.M.R.-Z ex rel. Ramirez-

Senda v. Puerto Rico, 528 F.3d 9, 13 n.3 (1st Cir. 2008) (and cases cited).  Thus, "reconstituted

IDEA claims cannot be brought under other federal statutes in an attempt to secure remedies

that are unavailable under the IDEA."  D.B. v. Esposito, 675 F.3d 26, 38 (1st Cir. 2012).  Where,

as here, "the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983 – or

any other federal statute for that matter – in an attempt to evade the limited remedial

structure of the IDEA."  Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 29 (1st Cir. 2006).  Similarly, "§

1983 is not available to provide a remedy for defendants' alleged violations of [plaintiff's] rights

under Section 504" of the Rehabilitation Act.  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 806

(3rd Cir. 2007) (cited in Rameriz-Senda, 528 F.3d at 13 n. 3).  For these reasons, the Doucettes

cannot maintain their Section 1983 claims based on alleged violations of the IDEA or the Rehabilitation Act.[7]

The plaintiffs' substantive due process claim fares no better. As an initial matter, it is an open question whether a substantive due process claim can be maintained by a student against his or her school. See Pollard, 132 F. Supp. 3d at 227-28. Assuming, arguendo, that such a claim can be maintained, in the instant case the gravamen of the allegations remain the denial of a FAPE. As detailed above, the plaintiffs' contention is that failing to have an adequate IEP, and failing to comply with their obligations under the IEP, the defendants caused B.D. serious harm. Whether stated in terms of substantive due process, or a denial of a FAPE, B.D.'s parents contend that their son was placed in "unsafe, unhealthy and life threatening situations at GPS" and needed to be provided "agreed upon services and education in a safe and appropriate learning environment." (Am. Compl. ¶ 61). For all the reasons detailed above in connection with the Rehabilitation Act claim, these § 1983 claims are, in essence, a denial of a FAPE and subject to the exhaustion requirements of the IDEA.

Finally, this court notes that in addition to the denial of the use of the service dog, the plaintiffs base their Section 1983 claim on the failure of the defendants to agree to an in-district or out-of-district placement and the failure to appropriately implement B.D.'s IEP. They also contend that GPS violated the IDEA's "child find" provision by delaying B.D.'s evaluation by an optometrist and, ultimately, denying B.D.'s evaluation by an optometric behavioral specialist. These specific objections are well-suited for evaluation by a BSEA hearing officer, especially given the broad scope of such hearings. See Rose, 214 F.3d at 210 (quoting 20 U.S.C. §

_____

[7] Moreover, as detailed above, the plaintiffs' Rehabilitation Act claim is, in essence a claim under the IDEA.

1415(b)(6)).  For all these reasons, the plaintiffs were obligated to exhaust all of the federal

claims unless they were excused from doing so.  For the reasons detailed below, they were not.

**D.  The Plaintiffs Were Not Excused from the IDEA's Exhaustion Requirements**

Plaintiffs argue that they should be excused from having exhausted their administrative

remedies under the IDEA with respect to their Rehabilitation Act and Section 1983 claims on

the grounds of futility and undue burden.  This court disagrees.

"Exhaustion may not be required where the pursuit of administrative remedies would

be futile or inadequate; waste resources, and work severe or irreparable harm on the litigant;

or when issues raised involve purely legal questions."  Pihl v. Mass. Dep't of Educ., 9 F.3d 184,

190 (1st Cir. 1993).  "A party who seeks to bypass the administrative process 'bears the burden'

of showing why futility applies."  Pollard, 132 F. Supp. 3d at 222 (quoting Frazier, 276 F.3d at

59).  Here, the plaintiffs' principal argument in support of their contention that administrative

exhaustion is futile is that the remedies plaintiffs seek (compensatory damages for physical

injuries B.D. sustained while attending GPS from July to September 2012 and for physical and

psychological injuries to his parents including the cost of medical care for B.D.'s five seizures)

are unavailable under the IDEA.  (See Pl. Opp. (Docket No. 57) at 6-14).  Admittedly, in Fry the

Supreme Court left open the question whether "exhaustion [is] required when the plaintiff

complains of the denial of a FAPE, but the specific remedy she requests – here, money damages

for emotion distress – is not one that an IDEA hearing officer may award[.]"  Fry, 137 S. Ct. at

752 n. 4.  However, First Circuit precedent clearly requires that the plaintiffs exhaust their

administrative remedies in such circumstances.

In Frazier v. Fairhaven School Committee, 276 F.3d 52 (1st Cir. 2002), the First Circuit expressly held that plaintiffs bringing an IDEA-based claim and who seek only money damages "must exhaust the administrative process available under the IDEA as a condition precedent to entering a state or federal court." Id. at 64. The First Circuit explained,

> [e]xhaustion is beneficial regardless of whether the administrative process offers the specific form of remediation sought by a particular plaintiff. After all, the administrative process facilitates the compilation of a fully developed record by a factfinder versed in the educational needs of disabled children – and that record is an invaluable resource for a state or federal court required to adjudicate a subsequent civil action covering the same terrain.

Id. at 61. "The IDEA's administrative machinery places those with specialized knowledge – educational professionals – at the center of the decisionmaking process, entrusting to them the initial evaluation of whether a disabled student is receiving a free appropriate public education." Id. at 60. Thus, "the educational expertise of the BSEA and its capacity to collect and evaluate a complicated educational record" can greatly assist a court "not only in crafting appropriate educational services, but also where the ultimate question is whether a disabled child was denied his/her right to an equal education[.]" CBDE Public Schs. v. Mass. Bureau of Special Educ., Civil Action Nos. 11-10874-DPW, 12-11082-DPW, 2012 WL 4482296, at *9 (D. Mass. Sept. 27, 2012) (internal quotations and citations omitted). Consequently, it is clear in the First Circuit that the fact that the plaintiffs are seeking only monetary damages does not relieve them of the requirement that they exhaust their administrative remedies.

The plaintiffs' other arguments are equally unavailing. For example, they argue that development of the factual record is not required in this case because the record has already been developed in the 2010 BSEA proceeding, and in connection with the parties' communications and agreement pertaining to B.D.'s IEP and eventual out-of-district placement.

(See Pl. Opp. at 11-12).  Similarly, plaintiffs argue that exhaustion should be excused on the basis that it would have been overly burdensome because plaintiffs had already adjudicated defendants' inability to implement B.D.'s IEP and provide for his education and safety needs in connection with the 2010 BSEA hearings.  (Id. at 11).  However, these arguments do not excuse exhaustion.  The facts central to this matter, relating to the circumstances that allegedly caused B.D. to suffer seizures during the summer of 2012 (in other words, the failure to appropriately implement his IEP and provide the supports he needed), had not occurred at the time of the 2010 BSEA hearing and have yet to be determined.[8]  In particular, but without limitation, the issue whether B.D.'s IEP should have been amended to add a service dog, or whether B.D. should have been entitled to additional visual screenings had not even arisen by the time of the 2010 hearing.  "[T]he BSEA's record [would] provide a fundamental and useful compilation of facts and initial legal analysis by an educational expert with respect to the educational claims. Consequently, neither the record nor the analysis would be, as [plaintiff] contends, inherently wasteful." CBDE Public Schs., 2012 WL 4482296 at *10.

Finally, plaintiffs argue that exhaustion is futile and should be excused because the condition creating the damage has ceased in that B.D. is no longer at GPS.  (See Pl. Opp. at 10). This argument was expressly rejected by the Frazier court in response to an argument that exhaustion should not be required where the student had already graduated.  Frazier, 276 F.3d at 63.  As the Frazier court held, not only is compensatory education an available remedy even after graduation, but "[t]he IDEA provides a comprehensive remedial scheme, and the plaintiffs

_____

[8] Moreover, the fact that GPS eventually agreed to an out-of-district placement does not mean that relevant, disputed facts have been established.

could have invoked it at any of several different points during [the student's . . .] school years. It would be a hollow gesture to say that exhaustion is required – and then to say that plaintiffs, by holding back until the affected child graduates, can evade the requirement." Id.

In sum, proceedings before the BSEA would provide a reviewing court with valuable information in this case, including, without limitation, whether the service dog should have been added to the IEP, whether B.D. was entitled to further optometric services, whether an in or out-of-district placement was required after the 2010 BSEA decision but before GPS agreed to one, and whether the defendants were appropriately implementing B.D.'s IEP during the summer of 2012. The plaintiffs have not met their burden of establishing that exhaustion of administrative remedies would be futile or unduly burdensome, since such proceedings would involve issues not previously addressed by the BSEA. Since the plaintiffs have failed to exhaust their administrative remedies, the federal claims must be dismissed.

## IV. CONCLUSION

For the reasons detailed herein, the defendants' Motion for Judgment on the Pleadings (Docket No. 48) and Supplemental Motion for Judgment on the Pleadings (Docket No. 61) are ALLOWED as to plaintiffs' Rehabilitation Act claim (Count IV) and Section 1983 claim (Count V). This court declines to exercise its pendant jurisdiction over the remaining state law claims, which are to be remanded to the state court.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge