UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RACHEL DOUCETTE, MICHAEL DOUCETTE, | ) | |
| for themselves and their minor son, B.D., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 15-13193-JGD |
| CAROL C. JACOBS, MARGARET MAHER, | ) | |
| CATHLEEN ESTEP, PH.D., DONNA F. | ) | |
| STRAIGHT, TOWN OF GEORGETOWN, | ) | |
| GEORGETOWN SCHOOL COMMITTEE, | ) | |
| and GEORGETOWN PUBLIC SCHOOLS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF DECISION AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

July 12, 2022

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiffs, Rachel Doucette and Michael Doucette, bring this action on their own behalf

and on behalf of their minor son, B.D., against Carol Jacobs, Superintendent of the Public

Schools for the Georgetown Public Schools ("GPS"); Margaret Maher, the Principal at the Penn

Brook Elementary School ("Penn Brook"); Cathleen Estep, the Interim Special Education

Director for GPS; Donna Straight, the Director of Special Education for GPS; the Town of

Georgetown (the "Town" or "Georgetown"); the Georgetown School Committee (the "School

Committee" or "GSC"); and GPS basically challenging their implementation of an Extended

School Year ("ESY") program for B.D. during the summer of 2012.  By their Complaint, the

Doucettes assert claims against the individual defendants for intentional infliction of emotional distress (Count I); negligence pursuant to Mass. Gen. Laws ch. 258, § 2 against GPS, GSC and the Town (Count II); loss of consortium pursuant to Mass. Gen. Laws ch. 231, § 85X against all defendants (Count III); violation of Section 504 of the Rehabilitation Act of 1973 against GPS, GSC and the Town (Count IV); violation of B.D.'s civil rights pursuant to 42 U.S.C. § 1983 against all defendants (Count V); and negligent infliction of emotional distress against GPS, GSC and the Town (Count VI).[1]

This court initially allowed the defendants' motions for judgment on the pleadings and dismissed the federal issues raised by this case on the grounds that the plaintiffs had failed to exhaust their administrative remedies.  This ruling was reversed by the First Circuit in Doucette v. Georgetown Public Schools, 936 F.3d 16 (1st Cir. 2019) which held, inter alia, that a Hearing Officer's review and assessment of the services provided to B.D. beyond that which was already in the record was not necessary for the court to resolve the issues presented.  Id. at 32-33.  The matter is presently before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 117), by which the defendants are seeking judgment as a matter of law on all the claims against them.  For all the reasons detailed herein, the defendants' motion is ALLOWED.

---

[1] The plaintiffs voluntarily dismissed claims for negligence and negligent infliction of emotional distress against the individual defendants.  (Docket No. 51).  In addition, they waived 42 U.S.C. § 1983 claims premised upon violations of the equal protection and procedural due process clauses of the United States Constitution, the Rehabilitation Act and the IDEA's Child Find Mandate.  See Doucette v. Georgetown Public Schools, 936 F.3d 16, 28 n. 18 (1st Cir. 2019).  This court had previously held that violation of the Rehabilitation Act and the IDEA could not form the basis of a claim under § 1983 since the statutes had their own framework for damages.  The Doucettes did not appeal this ruling.  Id.

The plaintiffs have a very high burden in this case. The First Circuit has explained that the defendants' "[l]iability depends upon a finding that the school district acted with 'deliberate indifference'" to B.D.'s safety and well-being. <u>Doucette</u>, 936 F.3d at 32. While the record establishes that the Doucettes were immediately and consistently dissatisfied with the services provided by GPS to B.D., and believed that the defendants were not strictly complying with B.D.'s Individualized Education Plan ("IEP") by, *inter alia*, failing to provide a sufficient level of consistency in personnel and equipment, the undisputed facts establish that the defendants were actively engaged in providing B.D.'s services and working to address both his needs and the Doucettes' concerns. It is not for this court to determine whether the defendants could have or should have provided better services to B.D. To meet their burden of proving that the defendants violated B.D.'s substantive due process rights – the plaintiffs' principal claim – the plaintiffs must establish that the defendants engaged in conduct that "shocks the conscience." <u>Cruz-Erazo v. Rivera-Montañez</u>, 212 F.3d 617, 622 (1st Cir. 2000) (and cases cited). Even reading the record in the light most favorable to the plaintiffs, they cannot meet this standard.

The plaintiffs also contend that as a consequence of the defendants' failure to provide necessary consistency, and the stress that that caused B.D., B.D. suffered "life-threatening" seizures. Even assuming that the defendants' alleged lack of consistency was actionable, this argument must fail. The record is devoid of any medical assessment that B.D. suffered "life-threatening seizures," and the plaintiffs have failed to establish that the defendants' actions were the cause of the seizures he suffered. Even more significantly, the record does not support a contention that the defendants should have acted sooner than they did in allowing the out-of-district placement that was ultimately provided. For these, and the other reasons

[3]

detailed herein, the plaintiffs have failed to meet their burden and summary judgment shall be entered in favor of the defendants.

## II. STATEMENT OF FACTS[2]

The parties have submitted overly detailed (and highly editorialized) statements of fact addressing the numerous interactions between them, but, unfortunately, omitted a comprehensive overview of events.  The following is such an overview to the best of the court's ability, with more facts provided subsequently as needed.  To the extent not included in the parties' statements of fact, relevant undisputed facts are taken from the Amended Complaint (Docket Nos. 20-2 at 6-15, and 20-3) ("AC"), this court's "Memorandum of Decision and Order on Defendants' Motions for Judgment on the Pleadings" (Docket No. 67) ("Pleadings Order")

---

[2] Unless otherwise stated, the facts are derived from: (1) "Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment" (Docket No. 119-1) ("DF") and exhibits attached thereto at Docket 119 ("Def. Ex. ___"); (2) the Plaintiffs' responses thereto as contained in the "Revised Statement of Undisputed Material Facts of the Parties in Support of Defendants' Motion for Summary Judgment and in Support of the Opposition of the Plaintiffs to Defendants' Motion for Summary Judgment" (Docket No. 134-1) ("PR") as well as the "Statement of Facts of the Plaintiffs" contained therein (Docket No. 134-1 at 54) ("PF") and (3) the exhibits attached to the "Opposition of the Plaintiffs to Defendants' Motion for Summary Judgment" (Docket No. 127) ("Pl. Ex. ___").  The defendants did not respond to the plaintiffs' facts so they are deemed admitted.  See Grundy v. HSBC Bank USA, N.A. as Trustee, No. 17-11449-PBS, 2020 WL 1326269, at *2 (D. Mass. Feb. 10, 2020) (quoting L.R. 56.1).  Since the defendants docketed their Statement of Undisputed Material Facts as Exhibit 1 to their Memorandum (Docket No. 119-1), to locate Def. Ex. on the CM/ECF system one needs to go the entry in Docket No. 119 one number higher than the Exhibit number, e.g. Docket No. 119-2 is Def. Ex. 1.  Unless otherwise indicated, page citations will be to the ECF pages or deposition transcript pages.

and the First Circuit's decision on the appeal therefrom, <u>Doucette v. Georgetown Public</u>

<u>Schools</u>, 936 F.3d 16 (1st Cir. 2019).

## Background

B.D. is a severely disabled student who attended the Perley Elementary School ("Perley") in

Georgetown from July 2009 to November 2012, from age three to six.  (AC ¶¶ 19, 50, 70).  B.D.

has Isodicentric Chromosome 15q Duplication Syndrome, a rare de novo genetic disorder.  (<u>Id.</u>

¶ 15).  As described in the Amended Complaint:

> As a consequence of this syndrome, B.D. has a number of substantial educational limitations,
> including global developmental delay, with a diagnosis of Pervasive Developmental Disability,
> Not Otherwise Specified (PDD, NOS), autistic spectrum disorder, seizure disorder, anxiety
> disorder, sleep disorder and gastrointestinal issues.  B.D. also has been diagnosed with
> attention-deficit hyperactivity disorder (ADHD), a history of choking, low muscle tone and
> balance defects, together with a high threshold for pain, limited ability to report injury or
> discomfort, sensory process disorder, visual problems, decreased personal safety awareness,
> maladaptive behaviors such as bolting and aggression, cognitive impairment and
> communication deficits.

(<u>Id.</u>; <u>see</u> <u>also</u> DF ¶ 3).  As further alleged in the Amended Complaint, "[c]hildren with

Chromosome 15q Duplication Syndrome have an increased risk of sudden unexpected death

(SUD)" caused by respiratory or cardiac arrest.  (AC ¶ 16).  The plaintiffs alleged that this

increased risk "is typically correlated with seizure activity[,]" as a result of which "the

prevention of seizures in such children is of critical importance."  (<u>Id.</u>).  A comprehensive

description of B.D.'s syndrome as well as his medical issues and treatment can be found in the

report of the defendants' expert, Dr. Mara Cvejic, D.O.  (Def. Ex. 23).

As a result of his medical condition, B.D. attended school under an IEP pursuant to the

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA") and the

Massachusetts Special Education statute, Mass. Gen. Laws ch. 71B.  Under these statutes, every

disabled student is entitled to receive a free and appropriate public education ("FAPE").  C.G. ex

rel A.S. v. Five Town Community School Dist., 513 F.3d 279, 284 (1st Cir. 2008).  Towards this

end, "school systems must take steps to identify children who may qualify as disabled, evaluate

each such child to determine his or her eligibility for statutory benefits, and develop a

customized IEP designed to ensure that the child receives a level of educational benefits

commensurate with a FAPE."  Id. at 285.  "To meet its substantive obligation under the IDEA, a

school must offer an IEP reasonably calculated to enable a child to make progress appropriate

in light of the child's circumstances."  Andrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-

1, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017).

In the instant case, B.D.'s IEP "required, among other things, that he receive a consistent

routine, a seizure plan, and one-on-one assistance, and that he participate in an extended-

school year ("ESY") program."  Doucette, 936 F.3d at 19.[3]  B.D.'s parents were immediately

dissatisfied with the services provided to B.D, and their dissatisfaction continued until B.D. was

given an out-of-district placement in 2012.

The Doucettes first sought an out-of-district placement for B.D. in 2010.  As described by

the First Circuit:

> B.D.'s parents were dissatisfied with the services provided to B.D. at Perley. Within
> months of his arrival, they began complaining to administrators, teachers, and the
> superintendent. In the spring, they met with his IEP team to formally request a change to

---

[3] As described by the First Circuit, "[a]n ESY program is a summer school program for students who
require year-round schooling to minimize substantial regression and reduce substantial recoupment
time."  Doucette, 936 F.3d at 19 n.5 (citing Todd v. Duneland Sch. Corp., 299 F.3d 899, 902, 907 (7th Cir.
2002)).  Plaintiffs take exception to this description of the ESY program, arguing that "B.D.'s ESY
placement, like his regular school year placement, was required to be reasonably calculated to enable
B.D. to make progress appropriate in light of B.D.'s unique circumstances" and not "merely to keep
students such as B.D. from regressing[.]"  (Pl. Rev. Opp. (Docket No. 134-2) at 8).  Since the outcome of
this case is the same regardless of which standard is applied, the standard will not be addressed further.
It is undisputed that B.D.'s IEP was designed to address B.D.'s needs during the entire year.

B.D.'s IEP, which was denied. In the weeks that followed, they continued to convey concerns, noting that B.D. was at times unsupervised, was bolting from class, and, on one occasion, fell and hit his head. Due to these concerns, the Doucettes removed B.D. from Perley, and he remained out of school from May to September 2010.

In July 2010, while B.D. was out of school, the Doucettes requested a hearing before the Massachusetts Bureau of Special Education Appeals ("BSEA"), seeking an amendment to B.D.'s IEP and an out-of-district placement for him. The hearing was held at the end of August, and, a month later, the BSEA hearing officer issued a decision. Although the hearing officer found that B.D.'s IEP was inadequate, the officer found that an out-of-district placement was unwarranted, and ordered a new IEP for B.D. B.D. then returned to Perley in the fall of 2010 with an amended IEP.

Id. at 19-20.  (See also Def. Ex. 6 at 22, 28).

After holding an evidentiary hearing, the Hearing Officer found that there was no evidence that school was unsafe and concluded that there was "nothing in the record to indicate that Georgetown should have done something more than it was already doing in order to create a safe educational environment for Student as of May 10th" when B.D. was removed from GPS after having slipped off a bean-bag chair and hitting his head.  (Def. Ex. 6 at 33, 16-17).  The Hearing Officer noted that the parties had all agreed that B.D.'s program should be changed to use Applied Behavior Analysis ("ABA") principles of instruction, including "discrete trial training."  (Id. at 21).  "Discrete trials" are "part of ABA where a [skill] is broken down into very discrete components, and you teach it in mass trials over and [over] again until the student has acquired the skill."  (Def. Ex. 3 at 16).  The Hearing Officer ordered B.D.'s IEP to be amended to detail the ways in which the ABA principles would be used for B.D.  (See Def. Ex. 6 at 21-28). He further concluded that B.D. had been removed from school prematurely by the Doucettes, and that if B.D. had been kept in school, he would have been able "to make substantial progress in many areas addressed by his IEP[.]"  (Id. at 32).  The Hearing Officer further noted that there

could have been "somewhat greater progress if Parents had accepted certain methodologies and otherwise cooperated with Georgetown." (Id.).

There is evidence in the record that the relationship between the Doucettes and the defendants became more strained after the out-of-district placement had been denied in 2010. (Def. Ex. 13 ¶ 6). The defendants attribute this at least in part to the fact that "there was a stark difference between the parents' perception of B.D.'s progress and that of B.D.'s IEP team of special education professionals." (Id. ¶ 7). Nevertheless, B.D. returned to the Perley school for the 2010-2011 school year with the new IEP incorporating ABA principles. See Doucette, 936 F.3d at 20.

### The Increase in B.D.'s Seizures

Despite the changes, the Doucettes remained dissatisfied with the services B.D. was receiving. (Id.). At around this time, B.D. had begun having "'staring-spells with eye-rolling' [which is] symptomatic of potential seizure activity." Id. (See also DF ¶ 19). By the summer of 2011, B.D. had increased seizure activity and the Doucettes were "working with his physicians to gain control of this issue." (DF ¶ 39; Def. Ex. 23 at 10).[4] However, the seizures apparently remained "uncontrolled" in 2011 and 2012, requiring seizure monitoring at Mass. General Hospital ("MGH") in May 2012 and modifications to B.D.'s medications. (See Def. Ex. 23 at 10-11). In addition to B.D.'s IEP, the parties developed supplemental safety plans and health care

---

[4] Seizure activity is common in children with B.D.'s medical conditions. (See Def. Ex. 23 at 9-10, 15). There is no allegation that the fact that B.D. suffered from seizures in and of itself was caused by the defendants. There is also evidence in the record that the defendants may have wanted more direct access to B.D.'s doctors than the Doucettes felt appropriate, especially about his seizures, but the absence of such direct access does not seem to be significant in how B.D.'s seizures were handled. (DF ¶¶ 17, 18, 81; PR ¶¶ 17, 18, 81; see also Def. Ex. 2 (Straight Aff.) ¶ 19; Def. Ex. 13 (Jacobs Aff.) ¶ 18).

plans for B.D., including a "seizure action plan." (See DF ¶ 97; PR ¶ 97; Def. Exs. 10, 16). The

plan was routinely updated. (Def. Ex. 9 at 153). B.D. has suffered from sleep difficulties since

infancy and was actively engaged in obtaining treatment to address his sleep issues. (See Def.

Ex. 23 at 8-9, 15-16). Until July 2012 his seizure action plan listed "sleep deprivation" and

"fever" as the principal triggers for B.D.'s seizures. (DF ¶ 97). On or about July 26, 2012, the

seizure action plan was amended to list "stress" as a trigger as well. (DF ¶ 59; PR ¶ 59; PF ¶

230).

According to the Doucettes, the seizure activity prior to the summer of 2012 "involved

non-emergent, absence seizure/staring spells" or "atypical absence seizures" that "were

addressed by the existing seizure plan and did not require removal from school pursuant to that

plan." (PR ¶ 39; PF ¶ 178). The Doucettes objected to the fact that the school had called Ms.

Doucette three times to take B.D. home due to seizure activity and they filed a disability

discrimination complaint with the United States Department of Education's Office for Civil

Rights based on their belief that B.D. had been dismissed from school on three occasions

against the seizure plan. (DF ¶¶ 39-42, 49; PR ¶¶ 39-42, 49; Def. Ex. 7 at 31).[5] B.D's physician

wrote a note stating that B.D. was "likely to have increased seizure frequency" but should

nevertheless be kept in school absent "signs of acute illness." (DF ¶ 42; PR ¶ 42). Thereafter,

the parties agreed that GPS would implement a seizure tracking form for use during the 2011-

12 school year, which it did. (DF ¶ 50). In addition, the School District coordinated and

provided a course called "Seizure Training for School Personnel." (DF ¶ 51).

---

[5] The outcome of this complaint is not clear from the record.

**The Service Dog**[6]

In the fall of 2011, B.D. began working with a service dog named McCloud at home, with the expectation that the dog would assist him with anxiety and balance and would alert B.D.'s caretakers to an impending seizure.  Doucette, 936 F.3d at 20.  (See also PR ¶ 114 (incorrectly listing the date as 2012); Def. Ex. 7 at 35).  The Doucettes wanted the service dog added to B.D.'s IEP, with the school being responsible for providing a handler for the dog.  See Doucette, 936 F.3d at 19-20; Def. Ex. 7 at 73.  For its part, while the School and School District were willing to work towards crafting a policy, there were concerns about who would be responsible for the dog during the day and the safety of other students.  (See DF ¶¶ 119-22 (Ms. Doucette recognizes the school needed to develop a policy for proper training, procedures and protocols for installing the service dog at school)).[7]  In addition, the defendants did not want to add the animal as an accommodation in B.D.'s IEP without collecting data through a behavioral

---

[6] The Doucettes originally based their Rehabilitation Act § 504 claim on the defendants' alleged failure to allow B.D. to have a service dog, claiming that as a result B.D. was denied safe access to school.  See Doucette, 936 F.3d at 26.  The plaintiffs have not raised this argument in opposition to the defendants' motion for summary judgment, and it is therefore waived**.** Eck v. Neal, No. 1:14-cv-13693-ADB; 2017 WL 4364171, at *6 n.5 (D. Mass. Sept. 29, 2017).  Since the service dog is no longer an issue in this litigation, only a brief description of the facts relating to the service dog will be addressed herein.

[7] There was a great deal of communications both between the defendants and the Doucettes, and among the defendants themselves, concerning how to handle the dog coming to school.  (See generally Pl. Ex. 28).  On June 1, 2012 arrangements were being confirmed about having Ms. Doucette bring the dog to school for a trial run.  Superintendent Jacobs sent an email to Kimberly Leonard and Margaret Maher saying "**Ok let the games begin**.  Seriously do we feel that everything is all set?  I am looking at this as an opportunity for her [Ms. Doucette] to see that the work that you are all doing is awesome." (Pl. Ex. 28 at 13) (emphasis added).  Quoting just the bolded language, the plaintiffs argue that "[i]t is a question of fact for the jury to decide whether Ms. Jacobs' email belies an underlying malicious intent and whether such intent influenced her actions and omissions." (Pl. Rev. Opp. at 12).  It is impossible to read an email pointing to all the work the school had done to try and accommodate the service dog as evidence of malicious intent.  In any event, such a stray comment is not sufficient to create a material disputed fact.  See Paul v. Murphy, 948 F.3d 42, 54 (1st Cir. 2020) ("Isolated, ambiguous remarks are insufficient, by themselves, to prove discriminatory intent") (quotations omitted)).

assessment, which was eventually scheduled to take place in the fall of 2012.  Doucette, 936 F.3d at 20.  (See generally Def. Ex. 23 at 12; DF ¶¶ 154-55).  On July 10, 2012, after B.D. suffered a seizure described below, Ms. Doucette was permitted to bring the service dog to school and serve as its handler, which she did.  Doucette, 936 F.3d at 20-21.  (See DF ¶ 163).  The dog was officially added as an accommodation, to be provided by the parents, to B.D.'s IEP on July 30, 2012.  (DF ¶ 162).  Unfortunately, the dog did not alert when seizures occurred.  (See, e.g., DF ¶¶ 98-99).

### The 2012 ESY Program

It is undisputed that B.D. attended school at Perley during the 2011-12 school year. While the Doucettes were not satisfied with the GPS program, there is evidence that B.D.'s doctors found that he was doing well.  (See PF ¶ 169).  Nevertheless, there is evidence in the record that in May 2012, the Doucettes requested that B.D. be transferred to an out-of-district placement at the Melmark school, which GPS was considering.  (See DF ¶ 153; PR ¶ 153). However, no details about this request are provided.

The crux of the Doucettes' complaint is that the defendants' conduct in connection with B.D.'s 2012 ESY caused B.D. to suffer "increased stress and dysregulation and triggering life-threatening seizures[.]"  (See PR ¶ 59).  The basic facts are not in dispute – there were changes in personnel and equipment during the summer program and B.D. did suffer seizures that resulted in his being taken to the hospital, although there is no evidence that he was admitted for treatment.  The defendants deny that the absolute consistency that the Doucettes wanted was necessary or required by B.D.'s IEP and argue that the record does not establish either that

B.D. suffered life-threatening seizures or that their behavior caused B.D. to suffer such seizures. As described below, the defendants' arguments are persuasive.

Due to the fact that there was going to be extensive construction at the Perley school that B.D. attended, the summer program was moved to Penn Brook.  The plaintiffs allege that the decision to move the program was made by Cathleen Estep, the Interim Director of Special Education at GPS, by no later than February 29, 2012, but they did not learn of the change until April 2012, while watching or attending a meeting of the Georgetown School Committee.  (PF ¶ 165, 167).  The ESY began at Penn Brook on June 26, 2012, a week earlier than usual, and extended a week later, to meet B.D.'s needs.  (Def. Ex. 2 ¶ 5).  B.D. was the only student in the ESY program for the first week.  (Id.).  The plaintiffs contend that the failure to advise them of the change in location violated their constitutional rights.

At the time of the 2012 summer program, those involved in B.D.'s medical care and education agreed that consistency was important for him.  For example, in a report dated March 2, 2012, by Dr. Amy K. Morgan, Ph.D., following her neuropsychological evaluation of B.D. at MGH, Dr. Morgan recommended that B.D.'s education program include "minimal changes (as much as possible) to B.D.'s routine and those individuals working with him including his teacher, aide, and therapist given that it is difficult for him to adjust to novel people, routines, and settings."  (PF ¶ 170 (punctuation omitted); Pl. Ex. 29 at 9).  She also recommended that B.D.'s "program be based upon repeated, planned teaching opportunities" and that a "portion of B.D.'s day should include structured intervention to facilitate and sustain peer interactions, reciprocal play and social communication."  (PF ¶ 170) (punctuation omitted).  These were also the goals of those implementing B.D.'s IEP.  (See PF ¶¶ 175-76, 190-91).

Nevertheless, and as described more fully below, the plaintiffs contend that the defendants did

not adequately prepare B.D. for the transition to a new school, that there were new aides who

were not, in the plaintiffs' view, adequately trained and there was unacceptable turnover in

those providing services to B.D.  In addition, the plaintiffs allege that the defendants failed to

bring over equipment for B.D.'s use to Penn Brook for several days after the ESY began.  The

issue raised in this litigation is whether these actions, if supported by the record, "shock the

conscience" in light of the defendants' understanding of B.D's difficulty with change.

### B.D.'s Seizures During the ESY Program

B.D. suffered seizures on July 5, 2012, July 18, 2012, July 31, 2012 and August 6, 2012, at

which time the Doucettes removed B.D. from school.  (See DF ¶ 60; PF ¶ 243).  B.D. was taken

to the hospital in connection with these seizures but there is no record that he was admitted.

The Doucettes contend (but the defendants deny) that these seizures differed in type from

B.D.'s earlier "atypical absence seizures" and were "tonic-clonic" seizures.  (Def. Ex. 18 at 45-47;

PF ¶¶ 210, 223, 238, 241).  The First Circuit described a tonic-clonic seizure as follows:

> A tonic-clonic seizure is a seizure of a serious nature, which is characterized by a loss of
> consciousness, and involves muscular contractions and relaxations in rapid succession.  See
> H. Gastaut, Dictionary of Epilepsy: Part I 67 (World Health Organization, ed. 1973).  A tonic-
> clonic seizure lasting over five minutes is a "life-threatening medical emergency requiring
> immediate     medical     help."     See     Tonic-Conic     Seizures,     Epilepsy     Ontario,
> http://epilepsyontario.org/about-epilepsy/types-of-seizures/tonic-clonic-seizures     (last
> visited May 6, 2019).

Doucette, 936 F.3d at 20, n.7.  As addressed more fully below, the plaintiffs have not submitted

any medical diagnoses of B.D.'s seizures as being tonic-clonic seizures.  The information from

B.D.'s treating doctor does not describe the seizures as tonic-clonic seizures, and B.D.'s Seizure

Plan, which was amended at the end of the ESY program, does not identify the seizures as tonic-clonic seizures.

The defendants have submitted evidence from persons who observed the seizures to the effect that the seizures were not different in kind than earlier seizures.  For example, according to Elizabeth Greenhagen, who supervised B.D.'s classroom:

> On July 5, 2012, I observed B.D. lying on a mat very still.  This was later identified as a seizure.  His, July 5, July 18, July 31 and August 5 seizures were all quite similar in appearance, except that he seemed a little more alert during the August 5 seizure than he had during previous seizures.  I did not observe any jerking motions that are associated with tonic-clonic seizures.  On each of these occasions, I was uncertain whether B.D. was having a seizure, or just very tired. . . .

(Def. Ex. 15 ¶ 21).  The defendants also have submitted expert testimony disputing that the seizures constituted tonic-clonic seizures.  (See Def. Ex. 23 at 23-24).  As detailed below, the plaintiffs have not met their burden of proving that B.D. suffered tonic-clonic or life-threatening seizures during the ESY program.

Specifically, on July 5, 2012, B.D. suffered a seizure at school which lasted approximately 40 minutes and resulted in B.D. being taken by ambulance to Lawrence General Hospital.  (PF ¶¶ 209-10).  This seizure was observed and treated by the school nurse assigned to B.D., who recorded her observations, and did not conclude that it was a tonic-clonic seizure.  (DF ¶ 65; PF ¶ 210).

On July 18, 2022, B.D. suffered another seizure at school that lasted 25 minutes and resulted in his being transferred by ambulance to MGH.  (PF ¶ 222).  Again this seizure was observed, treated and documented by the school nurse who did not find it to be a tonic-clonic seizure.  (PF ¶ 223).  By this time, B.D. was accompanied by his service dog, McCloud, at school

who was being handled by Ms. Doucette, but the service dog's presence did not prevent the seizure, nor did it alert to the possibility of a seizure.  (See DF ¶¶ 98-99; PR ¶¶ 98-99).

In Ms. Doucette's opinion, B.D.'s seizures were caused by an increase in B.D.'s anxiety. (PF ¶ 224).[8]  B.D. was seen by his epilepsy doctor on July 26, 2012, Dr. Ronald Thibert of MGH, who noted that "[B.D.'s] seizures have been a bit more frequent of the past few months with his last 2 seizures occurring on July 5 and July 18" but did not describe the seizures as different than earlier seizures or as tonic-clonic seizures.  (Def. Ex. 24 at 20).  Dr. Thibert also noted that B.D. "continues to make developmental progress overall, but his academic progress plateaued last year with his increased anxiety and inattention *after increasing his inclusion time"* and "regressed a bit over the summer *with less academic support*[.]"  (Id.) (emphasis added).[9]  On or about July 26, 2012, Dr. Thibert signed a new Seizure Action Plan that included, for the first time, the addition of stress as a trigger for seizures.  (PF ¶ 230).  However, "no additional details, instructions or recommendations were provided by Dr. Thibert . . . that indicated any further action or steps were required by GPS staff in the setting of this newly identified potential seizure trigger."  (See Def. Ex. 23 at 16).  Similarly, although Ms. Doucette was in the

---

[8] According to Ms. Greenhagen, who supervised B.D.'s classroom and was in frequent communication with the Doucettes, "Rachel Doucette never indicated to me that she believed the 2012 ESY program was causing B.D. stress at any point during the program.  She also never offered any suggestions as to anything I or B.D.'s aides should do to limit B.D.'s stress or anxiety during the program."  (Def. Ex. 15 ¶ 20).  The defendants also deny observing any evidence of stress on B.D.'s part.  (See, e.g., Def. Ex. 23 at 23; Def. Ex. 18 at 45-47).  These differences do not need to be resolved in connection with the pending motion as the issue is whether the defendants' conduct "shocks the conscience."

[9] While how much inclusion time B.D. should have with other students appears to have been an issue before the Hearing Officer in 2010, the record does not indicate that it was an issue in 2012.  (See Def. Ex. 6 at 28).  Nevertheless, the record evidence is that Ms. Doucette reported to the medical providers that she believed that inclusion time had caused B.D. stress.  (E.g., Def. Ex. 24 at 16, 21; PF ¶ 173).

classroom virtually every day with B.D. she did not identify anything specific which purportedly caused B.D. stress.  (See Def. Ex. 2 ¶¶ 12-13; Pl. Ex. 38 at 2).

The defendants were aware of the need to monitor B.D. for stress and to try and minimize his stress level.  As Donna Straight, the Special Education Director for GPS explained:

> B.D. had a dedicated, 1:1 aide assigned to him at all times during the 2012 ESY program. One responsibility of a 1:1 aide is to monitor the student with whom they are working for signs of increased stress that may impact his or her ability to comprehend, process or otherwise achieve the educational benefit intended from the performance of a particular task.
>
> When an increased stress level is noted in a student, the aide uses various strategies to try to reduce the student's stress, including lowering the difficulty level of or abandoning a particular task that may be perceived by the teachers and staff working with the student to be causing the increased stress.

(Def. Ex. 2 ¶¶ 9-10).  The School staff had a number of internal discussions regarding the importance of monitoring B.D. for increased stress levels, especially after stress was added as a trigger for seizures in B.D.'s Seizure Plan.  (Id. ¶ 11).

B.D. suffered a third seizure at school on July 31, 2012, which lasted for 23 minutes and resulted in B.D. being brought by ambulance to Lawrence General Hospital.  (PF ¶ 237).  The seizure was again observed, treated and documented by the school nurse, and again neither Ms. Doucette nor McCloud, who were present, anticipated the event.  (PF ¶ 238; DF ¶¶ 98-99). Again, the defendants contend that they believed it was an atypical absence seizure while the plaintiffs contend that it was a grand mal or tonic-clonic seizure.  (PF ¶ 238).

B.D. suffered a fourth seizure at school on August 6, 2012, which lasted for 28 minutes and resulted in his being transported to MGH by ambulance.  (PF ¶ 240).  Again, the plaintiffs characterize this as a tonic-clonic seizure, while the defendants do not.  (See PF ¶ 241).  Again, the school nurse observed, documented and treated B.D.  (PF ¶ 240).  Ms. Doucette and

[16]

McCloud were present for this seizure as well, but again did not anticipate its occurrence.  (See

DF ¶¶ 98-99).  Following this seizure, the Doucettes removed B.D. from the 2012 ESY program.

(PF ¶ 243).  In an email sent on the evening of August 6, 2012, Ms. Doucette notified the

defendants that she believed that the implementation of B.D.'s IEP had been "extremely poor

and ineffective" and "that GPS's lack of planning, training, and execution was unacceptable and

the most probable cause of B.D.'s extraordinary increase in seizure activity for the past month."

(PF ¶ 242).  B.D. continued to receive compensatory services at home after leaving school.  (DF

¶ 83).

In a letter addressed "To Whom It May Concern" dated August 24, 2012, Dr. Thibert

wrote for the first time that in his opinion B.D.'s "current school program has been inadequate

in terms of managing his seizures appropriately" and that since the seizures happened at

school, it must be "increased anxiety at his school program" which triggered the seizures.  (PF ¶

245).  No further analysis is provided nor is there any evidence that Dr. Thibert had any

conversations with school personnel, had undertaken a medical analysis of the cause of B.D.'s

seizures, or was doing anything more than repeating Ms. Doucette's complaints.  Dr. Thibert

further recommended as follows:

> We recommend that [B.D.]'s parents work with the school to develop an IEP which allows
> for appropriate placement.  We believe that this could include expert consultation to best
> assess his needs, strengths and weaknesses in the school setting.  We strongly suggest
> that this school utilizes Dr. Amy Morgan's neuropsychological evaluations as part of this
> consultation.

(PF ¶ 245; Def. Ex. 24 at 24).  Dr. Thibert further recommended that B.D. be kept out of school

until an appropriate placement was established.  (Id.).  Notably, neither Dr. Morgan (discussed

above) nor Dr. Thibert expressed the opinion that an out-of-district placement was required.

[17]

**The Start of the New School Year**

On August 30, 2012, prior to the start of the regular Perley school year, the Doucettes met

with School personnel to discuss how to go forward.  (Def. Ex. 12 at 67).  It appears that Dr.

Thibert either participated in this meeting or was consulted in connection with this meeting as

well.  (See id.; PR ¶ 80; Def. Ex. 9 at 143-44).  GPS agreed to honor the recently signed IEP and

the parties agreed to having B.D. placed at Perley, along with an agreement to have the Perley

program reviewed by outside professionals.  (See Def. Ex. 12 at 67).  In an email confirming the

agreements reached Ms. Straight wrote to the Doucettes that "GPS is expecting [B.D.] to attend

school on September 5, 2012.  Any extended absence will be considered truancy. "  (Id.).  While

the Doucettes characterize this as a "threat" Ms. Straight explained that she was concerned,

based on communications with the Doucettes, that they "might withhold B.D. from attending

school despite my and other Georgetown Public School staff members' attempts to work with

the Doucettes to address B.D.'s medical needs, and despite the fact that they had not sought

the assistance of the BSEA or the Department of Elementary and Secondary Education's

Problem Resolution System to address their concerns."  (Def. Ex. 2 ¶ 18).  According to the

defendants Dr. Thibert had agreed "that placement at Perley for September 5, 2012 was

reasonable with continued monitoring for stress triggers and appropriate programming[.]"  (DF

¶ 87; see also Def. Ex. 12 at 67).  Further, according to the defendants, Dr. Thibert had agreed

that in addition to the "need to assess the environment" "missed or poor sleep" were also

"common seizure triggers[.]"  (DF ¶ 87).[10]  While the Doucettes had a number of concerns

---

[10] This hearsay testimony about what Dr. Thibert stated is not considered by the court for the truth, but
rather as information relevant to assessing the defendants' state of mind.

about the services GPS was providing, they did agree to have him return to Perley, a school with which he was familiar.  (Def. Ex. 12 at 67; Def. Ex. 9 at 146; DF ¶ 92).

On September 5, upon arriving at Perley by bus with his mother for the first day of class, B.D. experienced another seizure. (DF ¶¶ 91, 93; PR ¶ 91, 93).  This seizure lasted 4 minutes, and B.D. was brought to MGH.  (PF ¶ 246).  The school nurse treated B.D. before he went to the hospital.  (PF ¶ 246).  The MGH medical record states that on September 5, 2012, B.D. had been "brought to the Emergency Department after a '15-20 minute absence-type seizure (his usual per mother who was present) at school'[.]"  (PF ¶ 247).  Other MGH records from that day state that B.D. had been brought to the Emergency Department "after what his mother described as a 19-minute staring episode consistent with the semiology of prior seizures[.]"  (Id.).  The record is not clear whether B.D. experienced the seizure upon exiting the bus or upon entering the school, and whether B.D. may have been showing signs of the oncoming seizure in the morning at home.  (DF ¶ 91; PR ¶ 91; Pl. Ex. 26 at 20).  At a subsequent meeting on September 11, 2012 between the Doucettes, Maher, Jacobs, and others the Doucettes stated that B.D. would not return to school at GPS. (PF ¶ 249).  At the meeting, "Ms. Jacobs suggested that anxiety at home that B.D. heard may have been contributing to his anxiety and that having Mrs. Doucette at school may have been stressful for B.D."  (PF ¶ 249).

Following this event, the Doucettes obtained reports recommending that B.D. be placed in an alternative school.  (See, e.g., Def. Ex. 24 at 29 ¶¶ 2-5; Pl. Ex. 35 at 3).[11]  In November 2012,

---

[11] None of these letters indicate that there was any independent investigation of the situation at GPS or any actual medical assessment as to the cause of seizures.  The letters merely repeat the Doucettes' complaints about the services provided by GPS.  The Doucettes also arranged for a social worker to file a 51A complaint with the Department of Children and Families ("DCF") on September 5, 2012, which he did "based solely on what the Doucettes relayed to him regarding the school's handling of the incident

GPS and the School Committee agreed to place B.D. in an extended evaluation in an out-of-district placement in the Greater Lawrence Educational Collaborative ("GLEC") in Methuen Massachusetts, and, after the evaluation period, agreed to an out-of-district placement.  (AC ¶¶ 67, 69-70).  The plaintiffs report that B.D. did not suffer any further seizures after leaving GPS, despite all the transitions that B.D. apparently went through.  (PF ¶ 257).  There is evidence in the record that B.D.'s seizure medication was also changed.  (See Def. Ex. 23 at 15 ("Following BD's seizure activity during the summer of 2012, BD's providers' concern about BD's potential sensitivity [to medication] was ultimately outweighed by their interest in preventing further seizures, which resulted in modifications to and a significant increase in his anti-seizure medications, as well as the addition of Keppra.")).

Dr. Thibert's medical reports indicate that B.D. was doing well at GLEC during the next two years.  (See, e.g., Def. Ex. 24 at 33 (6/30/13 report: "Overall, [B.D.] is doing very well and switching schools to GLEC has had a positive impact on essentially all aspects of his health and development"); 37 (3/28/14 report: until B.D. came home from school 5 days ago "significantly agitated" he had "continued to do well overall" and had "been making nice developmental progress after being placed at CREST (formerly GLEC).")).  On or about March 20, 2014, B.D. was sent home from school and appeared to be psychotic and suffering from "increased aggression, paranoia and hallucinations."  (AC ¶ 73; PF ¶ 258).  He was subsequently admitted to MGH for one week and then transferred to Hampstead Hospital in New Hampshire for three months.  (PF ¶ 259).  He was released in July 2014 to a residential and school program at the Berkshire

---

that day."  (PF ¶ 248; Pl. Ex. 31 at 20).  According to the Amended Complaint, DCF did not pursue the charge after speaking with GPS personnel.  (AC ¶ 68).

Meadows School in Housatonic, Massachusetts, which has "a strict behavioral program with lots of consistency, structure, and a positive approach." (PF ¶¶ 255, 259; AC ¶ 75). B.D. has done well at the school and he has remained there. (PF ¶ 260).

Additional facts will be provided below where appropriate.

### III. ANALYSIS

#### A. Summary Judgment Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that have "the potential of affecting the outcome of the case," and there is a genuine factual dispute where "the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (citations omitted). The court must review the record "in a light most favorable to the non-moving party[.]" Lima v. City of E. Providence, 17 F.4th 202, 206 (1st Cir. 2021). Nevertheless, the court "may ignore conclusory allegations, improbable inferences, and unsupported speculation." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (quotations omitted).

When a properly supported motion for summary judgment is made, "the nonmoving party must nevertheless 'set forth specific facts showing that there is a genuine issue for trial.'" Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 56-57 (1st Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). The non-moving party can avoid summary judgment only by providing properly supported evidence of a genuine dispute about material facts. See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st

[21]

Cir. 2018).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  Popular Auto, Inc. v.

Reyes-Colon (In re Reyes-Colon), 922 F.3d 13, 20 (1st Cir. 2019) (quoting Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986)).

Applying these principles to the instant case, the defendants' motion for summary

judgment is ALLOWED.

### B.  Claim pursuant to 42 U.S.C. § 1983 – Legal Standard

The Doucettes contend that the defendants are liable for violations of their

constitutional rights pursuant to 42 U.S.C. § 1983.  "As is well established, § 1983 creates no

independent substantive rights, but rather provides a cause of action by which individuals may

seek money damages for governmental violations of rights protected by federal law."  Cruz-

Erazo, 212 F.3d at 621.  As the court explained in Gutierrez-Rodriguez v. Cartagena, 882 F.2d

553 (1st Cir. 1989):

> In assessing the imposition of liability under § 1983, we must first ask "(1) whether the
> conduct complained of was committed by a person acting under the color of state law;
> and (2) whether this conduct deprived a person of rights, privileges, or immunities
> secured by the Constitution or laws of the United States." Parratt v. Taylor, 451 U.S. 527,
> 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), overruled on other grounds, Davidson
> v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). There are two aspects to
> the second inquiry: "(1) there must have been a *deprivation* of federally protected rights,
> privileges or immunities, and (2) the conduct complained of must have been *causally
> connected* to the deprivation." Woodley v. Town of Nantucket, 645 F. Supp. 1365, 1369
> n.4 (D.Mass.1986) (emphasis added).

Id. at 559 (emphasis in original).  Where, as here, "the defendants do not deny that they were

acting under color of Commonwealth law, our inquiry focuses on whether there was sufficient

evidence to establish both a constitutional deprivation and a causal connection between the

defendants' conduct and the deprivation." Id.  "[G]overnment officials may be held liable under § 1983 'for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights.'" Id. (quoting Germany v. Vance, 868 F.2d 9, 18 (1st Cir. 1989)).  In the instant case, the defendants argue that there was no violation of the plaintiffs' constitutional rights, and no causal connection between their actions and any harm B.D. is alleged to have suffered.

As noted above, the Doucettes have waived their § 1983 claims premised upon violations of the equal protection and procedural due process clauses of the United States Constitution, as well as those based on the Rehabilitation Act and the IDEA's Child Find Mandate.  See Doucette, 936 F.3d at 28 n.18; see note 1, supra.  Thus, the First Circuit described the Doucettes' § 1983 claim as follows:

> The Doucettes' § 1983 claim is premised on an alleged violation of B.D.'s substantive due process rights secured by the Fourteenth Amendment.  The Doucettes allege that these rights were violated during the summer and fall of 2012 when the school district, "despite having actual notice that Georgetown Public Schools was an inappropriate placement for B.D., refused to allow an in-district or out-of-district placement and threatened the Doucettes with truancy in the event of any extended absences."  They assert that this conduct amounted to "deliberate indifference and severe, pervasive disregard for the safety and well-being of B.D." and that, as a result, B.D. "suffered great physical and emotional harm," including "five life-threatening tonic-clonic seizures."

Doucette, 936 F.3d at 28-29 (internal punctuation and footnote omitted).  Since the Doucettes were able to obtain an alternative placement through the IDEA administrative process, the "premise of their § 1983 claim is that, while successfully pursuing the out-of-district placement, B.D. suffered harm from the delay in receiving the administrative relief." Id. at 30-31.  They are seeking "money damages for medical expenses arising from B.D.'s seizures and the physical, emotional, and psychological harm that B.D. experienced because of the school district's

'severe, pervasive disregard for (the) safety and well-being (of) B.D.'" Id. at 32. To prevail on

their claim, the plaintiffs must prove "that the school district acted with 'deliberate

indifference.'" Id. (citing Manarite v. City of Springfield, 957 F.2d 953, 955 (1st Cir. 1992) ("The

Supreme Court has made clear that Section 1983 permits recovery for . . . serious physical

harm[] only where the defendant acts *intentionally* or with an analogous state of mind usually

described as '*deliberate indifference*' to deprivation of the victim's constitutional right.")).

### Substantive Due Process

Under the Due Process Clause of the Fourteenth Amendment, a state is prohibited from

depriving a person of "life, liberty, or property, without due process of law." U.S. Const.

amend. XIV, § 1. "This guarantee has both substantive and procedural components. The

substantive due process guarantee functions to protect individuals from particularly offensive

actions on the part of government officials, even when the government employs facially neutral

procedures in carrying out those actions." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006).

"The substantive due process guarantee does not, however, serve as a means of

constitutionalizing tort law so as to 'impos(e) liability whenever someone cloaked with state

authority causes harm.'" Id. (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.

Ct. 1708, 140 L. Ed. 2d 1043 (1998)).

In order to prevail on a substantive due process claim, the plaintiff must prove that the

state's conduct "shocks the conscience." Cruz-Erazo, 212 F.3d at 622 (and cases cited). The

First Circuit has explained this very onerous burden as follows:

> "There is no scientifically precise formula for determining whether executive action is—
> or is not—sufficiently shocking to trigger the protections of the substantive due process
> branch of the Fourteenth Amendment." Pagán, 448 F.3d at 32. However, certain
> principles have emerged from the case law. Executive acts that shock the conscience

must be "truly outrageous, uncivilized, and intolerable," <u>Hasenfus v. LaJeunesse</u>, 175 F.3d 68, 72 (1st Cir.1999), and "the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error," <u>Amsden v. Moran</u>, 904 F.2d 748, 754 n. 5 (1st Cir.1990). Indeed, "[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." <u>González–Fuentes v. Molina</u>, 607 F.3d 864, 881 (1st Cir.2010) (internal quotation marks and ellipses omitted).

<u>Harron v. Town of Franklin</u>, 660 F.3d 531, 536 (1st Cir. 2011).

"Although each determination of whether state conduct 'shocks the conscience' is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred," there are circumstances where the facts alleged do not rise to the level of a constitutional violation and the court may rule as a matter of law.  <u>See</u> <u>Cruz-Erazo</u>, 212 F.3d at 622-24 (dismissing complaint for failure to state a claim where, although the question was "a close one," "the conduct alleged by appellants does not sufficiently shock the conscience so as to violate substantive due process[.]").  The First Circuit has offered guidance as to how to analyze the instant case.  As the Court explained:

> The Doucettes' § 1983 claim involves liability and damages issues. Liability depends upon a finding that the school district acted with "deliberate indifference." <u>See</u> <u>Manarite</u> v. <u>City of Springfield</u>, 957 F.2d 953, 955 (1st Cir. 1992). On that issue, which concerns the decisionmaking process of B.D.'s educators and school officials, an adjudicating court already has the benefit of the administrative record developed during the 2010 due process hearing in which the Doucettes sought an alternative placement for B.D, as well as the required documentation from the Doucettes' 2012 pursuit of an alternative placement for B.D. The latter records include school officials' documented reasons for continuing B.D.'s placement within the school district during the summer of 2012, and the final amended IEP, explaining the school officials' reasons for B.D.'s ultimate placement outside of the district. All of this documentation provides the educational expertise needed by an adjudicating court.

<u>Doucette</u>, 936 F.3d at 32.  While not all of this information appears to be included in the summary judgment record, an analysis of the information provided compels the conclusion that

[25]

the Doucettes have failed to establish that the conduct of the defendants "shocks the conscience" or that the defendants acted with "deliberate indifference."  While there were clearly differences in opinion as to the efficacy of the programming provided to B.D., and the Doucettes were not satisfied that B.D.'s IEP was being followed as strictly as they would have liked, even the most liberal reading of the record does not establish that the failures were substantial or that the defendants acted with "egregious" or "extreme" ill intent.  See Colón-Vazquez v. Dep't of Educ. of P. R., 46 F. Supp. 3d 132, 143 (D.P.R. 2014) (most courts assessing sufficiency of implementation of an IEP have held that "to prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP.") (quoting Houston Independent Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000)); Doe v. Dennis-Yarmouth Regional Sch. Dist., No. 21-cv-10172-PBS, 2022 WL 36480, *5 (D. Mass. Jan. 4, 2022) ("bad faith" violations of state law are not sufficient to state a substantive due process violation, there must "something more egregious and more extreme.") (citing Meléndez-García v. Sánchez, 629 F.3d 25, 37 (1st Cir. 2010)).

    **C.  Analysis of Substantive Due Process Claim**

**Events Leading Up to the Summer ESY**

As noted above, in 2010 the Doucettes requested that B.D. be placed out-of-district due to their concerns about his health and safety as well as the progress he was making at school. Doucette, 936 F.3d at 19-20.  (DF ¶ 15).  They raised substantially similar complaints to those they later raised in connection with the ESY program in 2012.  (See Def. Ex. 6 at 1-9 (hearing

[26]

request form)).[12]  However, in an opinion issued in September 2010, after a full evidentiary

hearing, the Hearing Officer concluded that there was no evidence that the school was unsafe,

or that GPS should have done anything differently to create a safe environment for B.D.  (Def.

Ex. 6 at 33).  The only modification to the IEP required by the Hearing Officer was "to include

two hours per week of consultation services from an ABA specialist," and the re-drafting of the

IEP "to reflect ABA principles, particularly with respect to addressing Student's behavior

deficits, daily living skills such as toileting, and other areas where individual instruction is called

for utilizing ABA methodology."  (Id. at 28).  The Hearing Officer also rejected the Doucettes'

request for compensatory services to compensate for the time he was taken out of school,

finding that B.D. could have made "substantial progress in many areas addressed by his IEP" if

he had been left in school, and if there had been more cooperation between the Doucettes and

Georgetown.  (Id. at 32).[13]  The Doucettes did not appeal the Hearing Officer's decision, and the

---

[12] The Doucettes had requested an out of district placement due to, *inter alia*, their concerns about B.D.'s "health and safety;" his "failure to progress;" his "difficulty with receptive language, written communication and social skills;" "B.D.'s aggressive and negative behaviors that placed him at serious risk of injury, including kicking, pushing, scratching, tackling, swiping, non-compliance, bolting and flopping;" the fact that there was "repeated non-compliance with B.D.'s IEP;" and "the District's lack of awareness that 'laughing uncontrollably' is a sign of a seizure," which was an indication that the District "was ill equipped to meet B.D.'s needs."  (DF ¶ 15).  The Hearing Officer carefully reviewed these claims and found that a claim of a head injury was not substantiated by any medical records (Def. Ex. 6 at 17 ¶ 30), found the GPS witnesses credible in connection with their evaluation of B.D.'s skills and potential, among other things, (id. at 22-24) and concluded that "[t]here is no evidence that, as a consequence of these or any other incidents at school, Student has ever been injured, other than a bump on his head as a result of slipping off a bean-bag chair on May 10th.  Neither the school nurse nor Parents' physicians found any indication of any substantial injury to Student as a result of the head-bump." (Id. at 33).

[13] Compensatory services are available when the "IEP is so inappropriate that the child is receiving no real educational benefit."  Maine Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 18 (1st Cir. 2003).  (See also Def. Ex. 6 at 29 (Hearing Officer explains that "[c]ompensatory relief is essentially a remedy designed to make a student whole – that is, to make up for what was lost as a result of not having received the requisite special education services.")).

record relating to the 2010 challenge to the IEP does not support the conclusion that the defendants acted with "deliberate indifference" to B.D.'s needs or otherwise engaged in any conduct which "shocks the conscience."

There is evidence in the record that after the Hearing Officer denied the Doucettes' request for an alternative placement, the relationship between B.D.'s parents and GPS personnel became even more strained.  (See Def. Ex. 13 ¶¶ 6, 7).  Nevertheless, the parties continued to work together to develop a new IEP for B.D., as well as supplemental safety plans and health care plans; to assess his progress; and to provide support services.  (E.g., Def. Ex. 10, 16).  The record is replete with copies of emails between the Doucettes and GPS personnel, establishing that the defendants addressed and responded to the Doucettes' daily concerns, even though not always to the Doucettes' satisfaction.[14]  (See Def. Ex. 7).  Notably, the plaintiffs' claim of substantive due process violations is premised on the defendants' conduct in connection with the 2012 ESY, and not their prior conduct, to which the plaintiffs also objected. The undisputed facts preclude a finding that the defendants acted with "deliberate indifference," or engaged in behavior that "shocks the conscience," before the summer of 2012, despite the fact that the Doucettes were extremely dissatisfied with the services provided.

---

[14] Dr. Mara Cvejic, one of the defendants' experts, characterized the tone of the Doucettes' correspondence as "combative and caustic" and noted that "GPS records indicate that multiple meetings and communications between BD's Parents and GPS administrators reveal the parents' nearly constant discontent with the actions of all GPS staff."  (Def. Ex. 23 at 11).  This court does not need to determine whether the Doucettes' frustration was warranted or not – just whether the defendants' conduct was sufficiently extreme to state a constitutional violation.

Of significance, during the summer of 2011, B.D. had increased seizure activity, and

B.D.'s doctors were trying to gain control of the situation by modifying B.D.'s medication.  (See

DF ¶ 39; Def. Ex. 7 at 23; Def. Ex. 23 at 10).  This resulted in a Seizure Action Plan for B.D. which

was routinely updated.  (Def. Ex. 9 at 153).  The Seizure Action Plan for B.D. which was signed

by the Doucettes on May 7, 2012, and was in effect during the early part of the summer of

2012, had been signed at a time when the Doucettes knew that ESY was going to be held at

Penn Brook.  (Id. at 152-53).  That Seizure Plan listed only sleep deprivation and fever as two

possible triggers for the seizures.  (PR ¶ 97).  During the 2011-12 period, the Doucettes' chief

complaint about the way the defendants were handling B.D.'s seizures was that GPS was

requesting that B.D. be taken home too often when he had a seizure, as a result of which the

Doucettes believed he was being deprived of his education.  (See PR ¶ 39 (the seizure activity

during this time "involved non-emergent, absence seizure/staring spells" that "were addressed

by the existing seizure plan and did not require removal from school pursuant to that plan.")).

In response to the Doucettes' concerns, the defendants added new seizure tracking forms and

training.  (DF ¶¶ 50-51).  This overly cautious handling of B.D.'s seizures does not support the

Doucettes' contention that the defendants acted with "deliberate indifference and severe,

pervasive disregard for the safety and well-being of B.D."  Doucette, 936 F.3d at 29.

### Status of Services Leading into 2012 ESY

Following necessary evaluative assessments,[15] many of which were conducted by GPS

personnel, an IEP was written to cover the period May 2012 – May 2013.  (See PF ¶ 187; Def.

Ex. 10).  The IEP was partially accepted by the Doucettes on June 5, 2012, and was then finally

---

[15] (See, e.g., PF ¶¶ 169, 172, 173, 174, 175, 176, 177).

accepted on July 30, 2012 after some objections were resolved.  (See PF ¶ 187 n.1).  As

summarized by the defendants' expert, Marlene Moskowitz Dodyk, Ph.D., a special educational

consultant for schools across Massachusetts:

> The partially accepted IEP of 5/2012-5/2013 outlined B.D.'s disabilities, explained recent evaluation results and progress over the past year, as well as included the district's and B.D.'s parents' vision for his future. B.D.'s parents' goal was for him to be performing at grade-level by the end of the IEP period. School staff articulated a vision that was more attainable for B.D. given his identified challenges. The IEP delineated how B.D. 's disabilities impacted his educational performance as well as other areas of his life, the types of accommodations needed for him to access the curriculum and necessary modifications to the curriculum. To determine goals in specific areas, B.D.'s current performance levels were outlined along with stated objectives used to measure progress towards associated goals in the areas of language, reading, math, motor, independence, social/emotional, school behavior, articulation, home/parent training, and travel training. The IEP defined consultation services (physical therapy, speech and language therapy, board certified behavior analyst-BCBA, applied behavior analysis specialist-ABA, and parent training) and special education services to be provided in the general education setting (physical therapy, inclusion time during lunch and recess) as well as those to be delivered within a special education classroom or related services therapy room (occupational therapy, physical therapy, BCBA time, speech and language therapy, special education instruction with special education teacher and 1:1 ABA teacher support). The Service Delivery page included summer services for eight weeks during the 2012 summer, commencing June 26, 2012, and ending August 16, 2016. The justification for special education services being provided outside of the general education setting and the specifics of B.D.'s specialized transportation plan including a nurse on the vehicle and aide assistance at home and at school at pick up and drop off locations (home and school) were also included. The Additional Information section of the IEP incorporated information considered relevant to B.D.'s education (Seizure Action Plan, Individual Health Plan, Field Trip Protocol, Training on Seizure Disorders to staff, dedicated 1:1 aide, touch screen device, and training for all staff on his Behavior Intervention Plan.

(Def. Ex. 22 at 1, 7).  The plaintiffs emphasize that the IEP included the following requirements:

- Limited environmental stimuli;
- Special consideration for B.D.'s sensory processing needs in any larger group environment;
- A quiet area for B.D. to seek quiet time;
- Supported seating;
- Picture schedule;
- Picture supports;

- Consistent routine;
- Multi-sensory developmental teaching approach;
- Transition cues, visual timer;
- Slant board;
- Sensory diet to include motor breaks, offered before any prolonged sitting activities;
- Staff will note, via communication log, changes in schedule, staffing, and drills;
- B.D. will be prepared for planned changes in staffing/schedule;
- A place to rest/sleep after experiencing a seizure;
- Adapted equipment for sitting at table and circle time; and
- Decreased visual stimuli on a page.

(PF ¶ 187).

The record indicates that B.D. was doing well prior to the ESY in 2012, despite the

Doucettes' dissatisfaction with the services provided.  In a report dated March 2, 2012, Dr. Amy

K. Morgan, B.D.'s neuropsychologist at MGH, stated:

> [B.D] was previously evaluated by this examiner in 2010 at which time general cognitive abilities were in the 'low average' range with relative strengths in communication skills and weaknesses in socialization skills.  He subsequently began receiving intensive ABA instruction **and has made marked gains in all skills**, and particularly in attention and behavior regulation.

(Pl. Ex. 29 at 6) (emphasis added).  (See also PF ¶173; Def. Ex. 24 at 16 (March 22, 2012 Report

of Dr. Ronald Thibert who noted that B.D. had had only two seizures since December – one at

school and one at home; some medication needed to be changed because it worsened B.D.'s

behavior, but B.D. "continues to make developmental progress with no signs of regression"

although "his academic progress has plateaued this year with his increased anxiety and

inattention after increasing his inclusion time.").  There is nothing in the record that indicates

that the defendants were in any way acting maliciously or inappropriately in their treatment of

B.D. leading up to the 2012 ESY.[16]  In fact, Dr. Morgan acknowledged that many of her

recommendations for B.D.'s educational program "may already be implemented in [B.D.]'s

current program."  (Pl. Ex. 29 at 9).

The record also establishes that those working with B.D. recognized the need for

routines and structure for B.D.  Thus, as quoted above, Dr. Morgan recommended that B.D.'s

educational program should include "[m]inimal changes (as much as is possible) to [B.D.'s]

routine and those individuals working with him including his teacher, aide and therapists given

that it is difficult for him to adjust to novel people, routines and settings."  (PF ¶ 170; Pl. Ex. 29

at 9).  B.D.'s special education teacher recommended that B.D.'s "day should be highly

structured with predictable routines" because B.D. "benefits from a highly structured

environment and schedule with predictable routines and familiar adults."  (PF ¶¶ 175-76).

Elizabeth Greenhagen, the Board Certified Behavior Analyst ("BCBA") who oversaw B.D.'s ESY

classroom (DF¶ 11) understood that "lots of consistency, routine, predictability" was needed

for B.D., and that it was important to keep B.D. as calm as possible both to prevent seizures and

so he could do his best work.  (PF ¶¶ 190-91).  The issue raised herein is whether the

defendants' actions were so inconsistent with these goals as to "shock the conscience" and

raise a sufficient issue for a jury to determine whether the defendants' conduct constituted

"severe, pervasive disregard for the safety and well-being of B.D." as to constitute a violation of

---

[16] This court recognizes that it is not enough to develop an appropriate IEP, it also must be implemented
in accordance with its requirements.  See Doe ex rel. Doe v. Hampden-Wilbraham Reg'l Sch. Dist., 715 F.
Supp. 2d 185, 195 (D. Mass. 2010).  This court has explained the details of the IEP to show that the
defendants were aware of their need to address the multitude of specials needs caused by B.D.'s
medical condition.  It is undisputed that B.D. received the specialized services called for by the IEP,
including speech, physical and occupational therapy and a 1:1 aide.

his constitutional rights.  <u>Doucette</u>, 936 F.3d at 32.  This court finds that even a most generous

reading of the evidence would not support such a finding.

### The Move to Penn Brook

The plaintiffs first challenge the fact that the defendants decided to move the summer

program from Perley to Penn Brook without their knowledge and argue that the jury should

decide whether the delay in informing the Doucettes was "knowing[ly], intentional and

improper" and constituted "evidence of an underlying malicious intent" and "shocks the

conscience."  (Pl. Rev. Opp. at 4).  There is no evidence in the record to support such a

conclusion.

The undisputed evidence is that the program was moved from Perley to Penn Brook

because a portion of Perley's roof had collapsed and it needed to be repaired.  (Def. Ex. 15 ¶ 9).

A most liberal reading of the record is that the decision to move the program, which was to

begin on June 26, 2012, was made by February 29, 2012 without input from the Doucettes, and

that the Doucettes were not informed about the move at an IEP meeting on April 9, 2012.  (<u>See</u>

PF ¶¶ 165, 167).  They did, however, learn about the move while watching and/or attending a

meeting of the Georgetown School Committee later in April.  (PF ¶ 167).  The ESY was extended

for two weeks beyond the normal six-week ESY program timeline, adding a week at the

beginning and a week at the end, to meet B.D.'s needs.  (Def. Ex. 2 ¶ 5).  The Doucettes signed

the IEP covering the summer program on June 5, 2012, knowing that the program was going to

be held at Penn Brook, and did not challenge the placement at Penn Brook.  (<u>See</u> Def. Ex. 10 at

63).

The Doucettes argue, without citation, that by the time they learned of the move to Penn Brook "it was too late for the Doucettes to arrange an alternative out-of-district placement for the summer of 2012 because such programs fill enrollment much earlier in the school year, and the defendants had effectively run out the clock and ensured that B.D. had no other alternative." (Pl. Rev. Opp. at 4). There is no support for this assertion in the statement of facts and no citation to any part of the record. There simply is no evidence that there was any wrongful intent in the alleged failure to inform the Doucettes of the move. Nor is there any evidence that the Doucettes were harmed by the sequence of events. See Doe v. Hampden-Wilbraham Reg'l Sch. Dist., 715 F. Supp. 2d at 198 (even assuming that the parents were not advised of changes in implementation of the IEP, there was no liability on the part of the school where "any lack of communication between the parents and the district (if indeed there was such a deficiency) did not prevent the district from providing a FAPE to [the student].").

The record evidence is that extensive work was required on the Perley roof during the summer of 2012, and that the decision to relocate the program to Penn Brook was made because of concerns that "numerous construction vehicles would cause congestion and potential traffic/safety issues, and that the construction itself would cause a significant amount of noise, safety hazards and disruption throughout the school property." (Def. Ex. 13 (Jacobs Aff.) ¶ 9). Penn Brook was also the location of another summer camp for children. (Def. Ex. 15 ¶ 9). According to Superintendent Jacobs, modifications were made to the Penn Brook playground in order to create a "smaller, safer area" in which the ESY children could play. (Def. Ex. 13 ¶ 11). Toys were brought from Perley, new toys were purchased to be used by the younger children and, in response to complaints by the Doucettes, a fence was installed around

the play area.  (Id.).  The Doucettes did raise complaints during the course of the summer about

the facilities, including that the facility was not completely ready at the onset of the summer

program, and that a delivery truck was allowed inside the playground area which interrupted

recess and was, in the Doucettes' view, inappropriate.  (DF ¶ 71; PR ¶ 71).  Even assuming that

the plaintiffs' objections to the use of Penn Brook were fully justified, however, the record

would not support any finding that the events surrounding the relocation of the program to

Penn Brook was done with any improper intent or callous disregard for B.D.'s well-being.

### Lack of Preparation for the Beginning of the ESY Program

The Doucettes next contend that the fact that the summer program at Penn Brook was

not fully operational at the start of the program is evidence that the defendants engaged in

conduct that shocks the conduct.  Ms. Doucette had taken B.D. to Penn Brook to try and

acclimate him to the new location on June 22, 2012, at which time she wrote to those involved

in the ESY program objecting to the fact that there had not been "a transition plan for B.D.

regarding the drastic change in location and staff that he would experience" and noting that,

despite promises to the contrary "there had been no fence and no playground climbing

equipment and that the classroom had had no workspace and no supplies" even though school

was to start in a few days.  (PF ¶¶ 196-99).  In addition, the Doucettes point to the fact that the

defendants had "failed to bring B.D.'s Rifton chair and slant board over from the Perley School"

and that there was no "sand table or waiting chair for B.D. in his classroom at Penn Brook."  (Pl.

Rev. Opp. at 6).  While conceding that the equipment was there a few days after the program

started, the plaintiffs argue "[f]or a child with severe autism such as B.D., the absence of and/or

changes in his reinforcers or accommodations can be monumentally disruptive and cause

severe emotional dysregulation.  B.D.'s parents have provided ample testimony that for B.D., such changes were tantamount to catastrophe."  (Id., citing Def. Ex. 24 at 24; Def. Ex. 28; Def. Ex. 9 generally, including 34-44, 66-70, 131-40).  The record does not support the premise of the plaintiffs' argument, namely that any changes in B.D.'s routines were dangerous, and/or that the defendants should have known that any change of the type at issue here would be catastrophic to B.D.[17]  Moreover, there is simply no evidence that the defendants acted with the intent to harm B.D. or with deliberate indifference to his well-being.

B.D. was the only student in the ESY program for the first week.  (Def. Ex. 2 ¶ 5).  In the defendants' view, this enabled staff "to appropriately transition him to the new program location without the usual distractions that may have ordinarily been caused by the presence of other ESY students."  (Id.).  For the remainder of the summer, B.D. was one of two students in the classroom.  (Def. Ex. 15 ¶ 10).  While this personal attention may not be an ideal substitute for earlier planning, it does not rise to a level of conduct that shocks the conscience.

It is undisputed that B.D.'s slant board was not brought over from Perley right away, and the plaintiffs allege that the staff had to make a slant board out of cardboard as a result.  (PF ¶¶ 205-07).  Similarly, it is undisputed that B.D.'s Rifton chair was not brought over from the Perley School at the beginning of the program, and other items used as reinforcers, such as dinosaurs and pictures, and B.D.'s sand table, were not brought over immediately either.  (PF ¶¶ 208, 215-16, 235).  While this may have been less than ideal on the part of the defendants, it does

---

[17] As detailed infra, the plaintiffs also have failed to prove that B.D. suffered "life-threatening" seizures during the ESY program.  Even assuming, however, that these seizures were more severe that those he had been suffering before, there is no evidence that the defendants had reason to know that their actions were either inappropriate or would cause B.D. any harm.

not rise to the level of extreme behavior.  These items were brought over within a few days,

showing that the defendants were aware of and responsive to B.D.'s needs.  (E.g., Def. Ex. 15 ¶

12 (according to Ms. Greenhagen, she does "not believe that any of B.D.'s usual items were

missing after that first day."); Def. Ex. 2 ¶ 6 (at her visit on July 2, 2012, Ms. Straight found Penn

Brook "to be equipped with all materials, tools and accommodative devices that are regularly

employed in special education and ABA-based instruction, including slant boards and

supportive seating."); Def. Ex. 13 ¶ 14 (Superintendent Jacobs confirmed "that the items had

been brought over right away" after it was learned that they had not been brought over

initially).  Further, according to Ms. Greenhagen:

> Throughout the entirety of the 2012 ESY program, B.D. was provided with a visual schedule
> and a picture exchange communication book that enabled him to request items and
> understand what his schedule entailed.  Additionally, a slant board and supportive seating
> were always available to B.D., even if the specific devices being used were not his usual
> devices.

(Def. Ex. 15 ¶ 14).[18]  While the plaintiffs challenge the sufficiency of the equipment used, the

record evidence is that the defendants were aware of B.D.'s needs and worked to

accommodate them.

There is nothing in B.D.'s IEP that requires that the same equipment must be used

consistently, or that any change in equipment would cause B.D. serious harm.  (See Def. Ex. 3

¶¶ 6-8; Def. Ex. 10 at 9-12).  In unrefuted testimony Dr. Estep has explained that many different

items can be used to provide the angled surface that is called for by a "slant board."  (Def. Ex. 1

---

[18] Plaintiffs argue that "B.D. did not need equipment that was theoretically 'available' but physically in a
different school building across town."  (Pl. Rev. Opp. at 7).  Plaintiffs' argument, however, is premised
on the assumption that the precise equipment used by B.D. at Perley had to be used during the ESY.
However, there is not such a strict requirement in B.D.'s IEP or in his doctors' recommendations.

¶¶ 6-8). Similarly, Dr. Estep explained that "'[c]onsistency' as an accommodation in an IEP does

not guarantee the same staff members will work with a student or that the student will have

the same classroom or playground; nor does it guarantee that the same exact devices, activities

or materials will be available to a student every day." (Id. ¶ 5). Moreover, according to the

defendants' expert, Dr. Dodyk, in an IEP the term "consistency" has a specific meaning and

> require[s] that the teacher and other staff working with a student develop routines,
> resources, and methodology that are applied and implemented in the same way on a
> regular basis. . . . "Consistency" is not to be equated with rigidity, however, as children
> with autism are commonly prone to inflexibility and addressing this characteristic is often
> essential to a student's continued emotional, social and academic development. . .
> "Consistency" or the modifier "consistent" within an IEP does not relate to staffing,
> location, the specific items used, etc.

(Def. Ex. 22 at 18). In the instant case, while Dr. Thibert signed a new Seizure Action Plan on

July 26, 2012 that added "stress" as a trigger for seizures, he did not add any instructions or

recommendations about the need for total consistency. (See PF ¶ 230; Def. Ex. 23 at 16). Dr.

Morgan, in recommending "minimal changes" to B.D.'s routine, recognized that absolute

consistency was not required and stated that the changes should be limited "as much as

possible." (PF ¶ 170). In short, the record does not support the plaintiffs' contention that the

defendants' failure to provide absolute consistency either violates B.D.'s IEP or constitutes

behavior that shocks the conscience.

The record also does not support the plaintiffs' contention that there is "ample

testimony" to support the conclusion that "such changes were tantamount to catastrophe."

(Pl. Rev. Opp. at 6). Thus, plaintiffs cite to Rachel Doucette's own emails (Pl. Ex. 28) and

deposition testimony (Def. Ex. 9). While she was clearly frustrated and unhappy with the ESY

program and B.D.'s progress, or lack thereof, Ms. Doucette is not qualified as an expert in any

relevant field and cannot opine as to whether changes in equipment would be catastrophic to a severely autistic child.  See Andrews v. Target Pharmacy, 714 Fed. App'x 4, 7 (1st Cir. 2017) (and cases cited) (expert testimony is generally required to establish medical causation).[19]

The plaintiffs also cite to a letter from Dr. Thibert dated August 24, 2012, after B.D. had been removed from the ESY program, addressed "To Whom It May Concern."  (Def. Ex. 24 at 24).  As noted above, Dr. Thibert had seen B.D. on July 26, 2012, a month after the ESY program had begun, and had found that B.D. was making developmental progress overall, but his academic progress had plateaued due to increased inclusion time the previous year, and that there had been "a bit" of a regression "in his development over the summer with less academic support[.]"  (Def. Ex. 24 at 20).  Dr. Thibert did not attribute B.D.'s increased seizures to any changes in the school setting even though B.D. had suffered two seizures at this point in the ESY program.  (Id.).

In his letter of August 24, 2012, Dr. Thibert stated for the first time that he believed that the "current school program has been inadequate in terms of managing [B.D.'s] seizures appropriately" based solely on the fact that "[e]ach of his last 4 larger seizures occurred in the classroom setting and he has been seizure-free since leaving his school program with no significant medication changes."  (Def. Ex. 24 at 24).  Dr. Thibert stated that B.D. "has been

---

[19] Moreover, the fact that the changes that occurred would be "catastrophic" is not intuitive and requires expert support.  For example, there is no explanation in the record as to why B.D. did not suffer any more seizures after leaving GPS despite having to deal with various changes in his educational settings.  Similarly, in her notes of April 12, 2012, Dr. Neumeyer reported Ms. Doucettes' concerns "that the high turnover and teachers and staff at school since the fall had been particularly disruptive to B.D. because he was very affected by changes in routine" and that "increased inclusion time had not been successful and that Rachel Doucette felt this had increased B.D.'s anxiety."  (PF ¶ 179).  Nevertheless, despite experiencing disruptions similar to those he allegedly confronted in the ESY program, according to the Doucettes B.D. had not suffered the same types of seizures.

having significantly increased anxiety at his school program and anxiety appears to be a significant seizure trigger for him." (Id.). Even ignoring the fact that Dr. Thibert does not appear to have undertaken any review of the school setting, and apparently relied only on the Doucettes' recitation of events, there is nothing in this letter which indicates that the move to Penn Brook and the change in equipment, which had taken place months before, was in any way "catastrophic" to B.D.'s well-being.[20]

In the absence of any evidence to support the Doucettes' argument either that the failure to bring over B.D.'s equipment was "monumentally disruptive and cause[d] severe emotional dysregulation" or that the defendants should have known that that would have been the consequences of their failure to have the equipment in place at the start of the ESY program, the defendants conduct cannot be deemed to shock the conscience or to state a violation of the plaintiffs' constitutional rights. See Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 824 (9th Cir. 2007) (fact that severely disabled student's behavior management plan was not implemented identically in middle school as in elementary school did not violate the IDEA where his IEP did not say the behavior management plan had to be implemented precisely the same way, and "the middle school did employ many of the techniques outlined in the behavior management plan, even if not quite as [the parents] envisioned.").

---

[20] The defendants have submitted expert testimony which challenges the conclusion that the lack of consistency in the onset of the ESY program would be "catastrophic" to B.D. Thus, Dr. Cvejic opined that "any delay in bringing over his specific supportive chair, usual slant board or other specific toys would not have caused BD undue and severe stress, given his proven developmental status." (Def. Ex. 23 at 22). This further supports the conclusion that the defendants' conduct did not rise to the level of a constitutional violation.

### Consistency and Qualifications of Staff

Throughout the course of the ESY program, the Doucettes were dissatisfied with the qualifications of some of the personnel and claimed that there was an inappropriately high level of staff turnover.  Unfortunately, neither party has presented the facts of what occurred during the summer in a way that the court can actually ascertain what happened.  The same complaint regarding "high turnover of teachers and staff at school" had been made by the Doucettes regarding the entire school year before the ESY program began.  (See PF ¶ 179).  Again, however, even reading the record most favorably to the Doucettes, and assuming that there were new therapists introduced and a high level of turnover of staff, there is insufficient evidence from which a jury could find that the school district acted with "deliberate indifference" to B.D.'s needs.  Doucette, 936 F.3d at 32.

As an initial matter, like in the case of B.D.'s equipment, there is no evidence that B.D.'s IEP or doctors mandated absolute consistency in personnel.  Moreover, according to Superintendent Jacobs:

> [t]he 2012 ESY program hired the same staff we would have hired if the program had been held at Perley, with the same qualifications and at the same student-staff ratios. We also hired a full-time nurse to support the students like BD at Penn Brook in the summer of 2012 due to their medical needs.  Previously there was staffing coverage at Perley during prior ESY programs but it was sometimes shared with programs at the other schools.

(Def Ex. 13 ¶ 10).  Apparently, "[s]taffing changes are common during ESY programs because teachers are not contracted for the entire calendar year."  (Def. Ex. 15 ¶ 17).  Thus, for example, there was a new speech pathologist added to the team, to whom the Doucettes objected.  (PF ¶ 186).  The defendants explained the reason for the change (medical reasons), that steps were taken to transition to the new provider, and the Doucettes were assured that

the new therapist was familiar with B.D.'s IEP and plans.  (DF ¶¶ 35-36; Pl. Ex. 28 at 10).  B.D.

was provided with "another aide, who had more than 25 years of speech and language

experience in a school setting."  (DF ¶ 36).  While the Doucettes continued to object and

challenge the staffing decision (see Pl. Ex. 28 at 10), it cannot be said that the defendants acted

with callous disregard to B.D.'s well-being.

      The record does not support a contention that the persons providing services to B.D.

were so ill-equipped to handle his needs as to shock the conscience.  For example, Ms.

Greenhagen, who worked with B.D. during the school year, was the Board Certified Behavior

Analyst (BCBA) who worked with B.D. during the ESY program in 2012.  (Def. Ex. 15 ¶¶ 1, 7, 9;

Def. Ex. 3 at 27).  She is not a defendant to this action and the Doucettes have not taken the

position that she was not qualified.  During the ESY, Ms. Greenhagen "spent approximately 70-

80% of [her] time in the classroom supervising the aides working directly with B.D."  (Def. Ex. 15

¶ 10).  The aides conducted "discrete trials" which are part "of the applied behavior analysis

(ABA) methodology that is particularly helpful in the instruction of educational concepts with

children diagnosed with autism spectrum disorder (ASD)" like B.D.  (Id. ¶¶ 8-10).  As Ms.

Greenhagen explained:

> During the 2012 ESY program, I would assist with the provision of behavioral services to
> B.D. pursuant to his IEP when appropriate, and provide guidance to the aides who
> performed discrete trials with B.D.  I also consulted with his IEP team, analyzed and
> collected data on B.D., and met with B.D.'s mother, Rachel Doucette, to perform parent
> training.  I was also present to ensure the program was run correctly.
>
> All of my time in the classroom while students were present was spent working with those
> students.  B.D. had only one other classmate that summer.  Since I did not typically
> perform the discrete trials myself, my time was spent observing the aide working with
> B.D. I made suggestions wherever I felt they were needed to ensure that B.D.'s curriculum
> was implemented with fidelity.

[42]

(Id. ¶¶ 7-8).  Thus, while the Doucettes' criticism of the quality of the services provided may or may not have been warranted, the record does not support a conclusion that there was a callous disregard to the need to have trained personnel to work with B.D.

B.D.'s first aide during the 2012 ESY program was a woman named Kristine Dancause. (Id. ¶ 17).  It is undisputed that Ms. Dancause was new to the field, and Ms. Greenhagen "trained her before and after school in areas specific to B.D.'s programming, as well as while she worked with B.D."  (Id.; see also PF ¶ 194).  In addition, Ms. Dancause attended seizure training that was specific to B.D.'s needs.  (Def. Ex. 15 ¶ 17).  Thus, while the plaintiffs challenge the sufficiency of such training, the record does not support the conclusion that Ms. Dancause was simply thrown into the situation without support.  Nevertheless, it appears that Ms. Dancause was replaced in response to Ms. Doucette's complaints.  (See PF ¶ 217; Def. Ex. 13 ¶¶ 12, 17).  According to Ms. Greenhagen, "B.D.'s other aides during the 2012 ESY summer program, Brooke O'Neil and Bridget Wallace, were experienced in administering discrete trials." (Def. Ex. 15 ¶ 18).  While there was no special education teacher assigned specifically to B.D. during the ESY, Ms. Greenhagen believed that staffing was still adequate and that the work could be and was done by the 1:1 aide and therapeutic staff.  (Def. Ex. 3 at 67).  The record does not support a conclusion that the defendants acted with "deliberate indifference" to B.D.'s needs.

The plaintiffs cite to the following emails as evidence that "the defendants knew that they had not hired a special education teacher, knew that the staff being hired did not have the right experience, and knew that the new staff was not being trained[.]"  (Pl. Rev. Opp. at 5 (citing PF ¶¶ 184-85)).  Based on this evidence the plaintiffs argue that "[i]t is a question of fact

for the jury to decide whether such abject failures of staffing and training and general lack of preparation for the ESY of a severely disabled student evidence an underlying malicious intent and shock the conscience in the circumstances presented here." (Pl. Rev. Opp. at 5-6). However, such communications, which make clear that the defendants were aware of the need to train B.D.'s aides and were making arrangements to do so, do not support a finding of "malicious intent" or constitute conduct that "shocks the conscience."

Thus, on May 25, 2012, Kimberly Leonard, the Special Education Coordinator for GPS (DF ¶ 12) wrote to Dr. Estep, Superintendent Jacobs, Principal Maher, BCBA Greenhagen and Gord Brady re "training for BD aide." (Pl. Ex. 28 at 8). She wrote:

> Hi – before I forget:
>
> We need to set up training in ABA/discrete trials for a summer aide who will be assigned to BD over the summer. It sounds like none of the hired applicants have the experience. Could we identify the person, pay them for time and:
>
> - Have them observe in the Perley transition room for 2 hours
> - Meet with Beth [Greenhagen] for 2-3 hours
> - Meet with nurse to review health, safety, seizure plans
> - Schedule for CPR/seizure
>
> If this is documented, are we comfortable we are in compliance with iep? Other thoughts?
>
> Kim

(Id.). On May 29, 2012, Ms. Maher responded to Kim in part:

> Hi Kim,
>
> In addition to cpr and epilepsy training, what about opi training?

[44]

His seats now are required to have that.  That is the most difficult training to offer.  **I worry that as we hire, they are not being trained –but perhaps I am wrong that it is a requirement.**

(Id. at 9).  Plaintiffs quote only the bolded language and then argue that there was a knowing failure to train.  (See PF ¶ 185; Pl. Rev. Opp. at 5).  However, the quote cannot be taken out of context.  Not only was Ms. Maher referring to a specific type of training, and asking whether it was needed, but the email chain shows that the defendants were taking many steps to ensure that the staff was appropriately trained for B.D.  Furthermore, in addition to the extra-curricular training being proposed, Ms. Greenhagen, who was well-qualified, was to be in the classroom to provide close supervision and training.  Again, there is no record support for the generalized allegation that the defendants acted with willful disregard for B.D.'s well-being.  The evidence is insufficient to meet the plaintiffs' onerous burden.

## The Cumulative Effect of the ESY Program

Plaintiffs argue that the fact that B.D. suffered "life-threatening" "tonic-clonic" seizures, and considering their expert's opinion, there is sufficient evidence to establish that there are disputed facts from which the jury can find in their favor.  However, the record does not support their generalized and conclusory arguments.

As an overview of the chronology, the plaintiffs contend that B.D. suffered "tonic-clonic" seizures on July 5, 2012, July 18, 2012, July 31, 2012 and August 6, 2012 before he was removed from the ESY program by his parents.  They also contend that in their opinion, there was something at the school that was triggering these seizures, based solely on the fact that they

did not take place at home, but these triggers were never identified.[21]   The IEP did not add

"stress" as a factor for triggering seizures until July 30, 2012, and at that time B.D.'s doctors did

not suggest that changes should be made to his program to eliminate such stress.  (DF ¶ 59; PR

¶ 59; see Def. Ex.10).  B.D.'s therapy dog and his mother were present for all but the July 5th

seizure but did not notice anything unusual that would have triggered the seizures.  (See Pl. Ex.

38 at 2).

It is undisputed that there were "no visible warning signs of impending seizures" and

Ms. Doucette admitted that they "just happen."  (DF ¶ 95).  While the Doucettes repeatedly

stated that they believed "that something or someone within GPS is a primary trigger for B.D.'s

seizures" they could never be more specific than that, despite the fact that Ms. Doucette

attended school with B.D.  (See DF ¶ 64; Pl. Ex. 38 at 2).  The Doucettes kept B.D. in school until

August 6, 2012, because, according to the plaintiffs, it was not until then that "Rachel had full

---

[21] Not surprisingly, the defendants contend that the parents' own stress contributed to how B.D. reacted at school, and deny that B.D. exhibited any signs of stress.  (See, e.g., PF ¶ 249; Def. Ex. 23 at 15 (B.D.'s doctor, Dr. Mathews, listed "family stress as a diagnosis"); Def. Ex. 15 ¶¶ 26-28 (Ms. Greenhagen did not "witness[] any behavior in B.D. that indicated he was stress[ed] or becoming anxious[,]" believed that "B.D.'s behavior during the 2012 ESY program was no different than his behavior during the 2011-12 school year" and that after B.D. returned to school after each seizure he "demonstrated the same behavior and cognitive abilities that he did before.").  Again, this issue does not need to be resolved in the absence of conduct on the part of the defendants that "shocks the conscience."

grasp of what was happening."  (PR ¶ 63).  Until that time "Mrs. Doucette believed that there

was a chance that GPS would be able to implement the program effectively."  (PR ¶ 77).

As detailed herein, the plaintiffs have failed to prove either that B.D. suffered life-

threatening seizures or that the defendants were the cause of the seizures suffered during the

ESY program or on September 6, 2022.

### Tonic-Clonic Seizures

As an initial matter, the plaintiffs have failed to prove that B.D. suffered "tonic-clonic" or

"life-threatening seizures."  The defendants deny that these four seizures during the ESY

program (or the later one in September 2012) were of a different type than the multiple

seizures from which B.D. had suffered before.  (See, e.g., PF ¶¶ 223, 238, 241).  Such earlier

seizures were described by the parties as "atypical absence seizures" or "staring spells."  (PF ¶

178).  Without minimizing the significance of any seizures, tonic-clonic seizures are more

serious.  However, there are no records from the emergency room or any other medical

personnel diagnosing B.D.'s seizures as tonic-clonic seizures.  The school nurse, who observed

and treated all the seizures, did not describe them as tonic-clonic seizures, and did not observe

the "muscular contractions and relaxations in rapid succession" that characterizes such

seizures.  See Doucette, 936 F.3d at 20, n.7.  (See also Def. Ex. 17 (seizure reports)).  Neither did

others who were present.  (See, e.g., Def. Ex. 15 ¶ 21).  The actions taken in May and June in

response to the seizures were the same as previously taken, and B.D. did not stop breathing

during the seizures.  (DF ¶¶ 104, 106).  B.D.'s treating epilepsy doctor also did not characterize

the seizures as tonic-clonic or life-threatening seizures.  (See Def. Ex. 24 at 20 (Dr. Thibert just

notes on July 26, 2012, that B.D.'s "seizures have been a bit more frequent of the past few

months")).  In fact, the seizure action plans Dr. Thibert signed on July 26, 2012, and again on

September 4, 2012, continued to describe B.D.'s seizures as "atypical absence seizures."  (DF ¶¶

102, 108).

The plaintiffs rely on the reports issued by the Fire Department recording that B.D. was

transported by ambulance in response to calls from the school.  (Pl. Ex. 26).  However, these

reports do not purport to be medical diagnoses in any way and simply report that the "nature

of call" was "seizures/convulsions" which appears to be a pre-selected option.  The reports do

not describe the active convulsions which characterize tonic-clonic seizures.  More importantly,

there is no evidence in the record that EMT personnel would even be qualified to make such a

diagnosis, and there is, in fact, evidence to the contrary.  Thus, defendants' expert Dr. Cvejic, a

Board certified pediatric neurologist and sleep specialist has explained that while "EMTs and

paramedics play an essential role in the care of patients who have experienced a seizure and

require transport to the hospital" "the classification of seizures and underlying anatomical

causes for these seizures must be determined by the patient's neurologist following the benefit

of a complete medical history in a non-emergent setting."  (Def. Ex. 23 at 24).  The plaintiffs

have not challenged this opinion.  Plaintiffs have not met their burden of proof that B.D.

suffered tonic-clonic or life-threatening seizures.  See Kerlinsky v. Sandoz Inc., 783 F. Supp. 2d

236, 242 (D. Mass. 2011) (and cases cited) (where medical issue is beyond the knowledge of the

ordinary layman, expert medical testimony is needed).  On the other hand, the defendants'

expert, Dr. Cvejic opined that based on the description of the seizures, "the lack of any

medically-based indicia in BD's medical records that BD experienced any tonic-clonic seizures,"

the fact that "BD was not intubated, sedated and admitted for observation and further

treatment in the critical care unit," and other factors, it is her "professional opinion to a reasonable degree of medical certainty that BD's seizures between July 5, 2012 and September 5, 2012 were more likely than not atypical absence seizures as opposed to tonic-clonic or grand mal seizures."  (Def. Ex. 23 at 24).  Thus, the premise of the plaintiffs' claim, that the defendants' conduct caused B.D. to suffer life-threatening seizures, is not supported by the record.

### Insufficiency of Plaintiffs' Expert Reports re Causation

The plaintiffs have also failed to meet their burden of proving that the seizures B.D. suffered were caused by any wrongful conduct on the part of the defendants.  Plaintiffs rely on their expert, Sue X. Ming, M.D., Ph.D.  (Pl. Rev. Opp. at 11).  It is well-settled "that understanding medical causation is a matter beyond the common knowledge of the ordinary layman and proof of it must rest upon expert medical testimony."  Jackson v. Johnson & Johnson and Janssen Pharms., Inc., 330 F. Supp. 3d 616, 625 (D. Mass. 2018) (internal quotation omitted).  However, Dr. Ming's expert report is insufficient to establish that the defendants' actions caused B.D.'s harm.

Dr. Ming opined:

In the months leading up to the summer of 2012, B.D. had been experiencing mild complex partial seizures without motor generalization, referred in records to as petit mal seizures or staring spells, during which he appeared to lose focus and/or experience very mild lapses of consciousness, followed by a quick return to normal alertness.

B.D.'s seizure activity increased significantly in both severity and frequency during the summer of 2012 while B.D. was a student at the Penn Brook School in the Extended School Year (ESY) program.  During the 2012 ESY program, the defendants **failed to meet several of B.D.'s IEP Requirements** – requirements that were designed to prevent stress, anxiety, dysregulation, disruption, and/or seizures – and these failures in conjunction with **an unusually high number of changes** in and/or absences of location, playground, staff, routine, schedule, slant board, Rifton chair, play toys, etc., at the Penn

Brook School caused B.D. to suffer increased stress, anxiety, and dysregulation, and ultimately caused the dramatic increase in his seizure activity.

Each of the five significant generalized convulsive seizures between July 5, 2012 and September 5, 2012 resulted in B.D. being taken by ambulance to the hospital. **Following these five seizures, he regressed to being unable to speak, learn, or move at his previous levels.** His speech became further impaired, and he was no longer able to perform activities such as riding a tricycle, doing jumping jacks, reading sight words, completing pincer grasp, negotiating stairs, hopping on one foot, or writing his name, among other things, and he experienced an exacerbation of this behavioral disorders. **As a consequence of such regression, B.D. had to be placed in a residential facility for his safety and well-being, where he continues to reside to this day, almost nine years later.** Of note, there has been no report of B.D. suffering a single seizure of any kind since he was removed from the Georgetown School system in September of 2012.

(Pl Ex. 32 at 2-3) (emphasis added).

This court is cognizant of its role in connection with a summary judgment ruling, and that it is not a trier of fact. Nevertheless, the court has a "gatekeeping role" under Rule 702 of the Federal Rules of Evidence, to ensure "that an expert's testimony as to scientific, technical, or other specialized knowledge 'both rests on a reliable foundation and is relevant to the task at hand.'" McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418, 423 (D. Mass. 2008) (quoting Hochen v. Bobst Group, Inc., 290 F.3d 446, 452 (1st Cir. 2002) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993))). "To fulfill this gatekeeping role, a court first must determine whether the expert possesses some specialized knowledge such that his or her testimony will be helpful to the trier of fact and, if so, whether the knowledge arises from reliable principles and methods applied in a reliable manner." Id. "Rule 702 encompasses an array of expert witness issues, including the qualifications of the witness, the relevance of the proffered testimony, the adequacy of the facts or data underlying an opinion, the scientific reliability of the witness's methodology, and the reliability of the witness's application of that methodology to the facts." United States v.

[50]

Diaz, 300 F.3d 66, 75 (1st Cir. 2002).  This analysis is applicable to the summary judgment phase

of civil litigation, and "[i]f proffered expert testimony fails to cross Daubert's threshold for

admissibility, a district court may exclude that evidence from consideration when passing upon

a motion for summary judgment."  Cortés-Irizarry v. Corporación Insular De Seguros, 111 F.3d

184, 188 (1st Cir. 1997).  On the other hand, "given the complex factual inquiry required by

Daubert, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of

expert proof on a truncated record."  Id.  This is one of those clearcut cases.

There are obvious problems with Dr. Ming's generalized description of the events during

the ESY – references to the failure to meet "several of B.D's IEP requirements", and "unusually

high number of changes" without any analysis is not helpful.  Nowhere does Dr. Ming address

the actual events as they transpired – such as the fact that equipment was brought over within

days of the program beginning, and the consistency of much of the staff.  Nor does she point to

any contemporaneous reports that indicate that B.D. was stressed as a result of these events.

These factors (and others) must be considered to provide a credible opinion.  Moreover, the

determination that the events at GPS would have caused B.D. stress is not without question.  In

fact, the defendants have submitted the expert report of Dr. Cvejic, who opined in part:

> BD was always accompanied by 1:1 aides who attended to his needs and who were
> present to observe his stress levels with each activity.  Additionally, GPS records reflect
> that his usual routines were followed to the extent possible during the modified school
> schedule during the 2012 ESY program.  BD was consistently provided all
> accommodations when school staff deemed them necessary, and **any delay in bringing
> over his specific supportive chair, usual slant board or other specific toys would not
> have caused BD undue and severe stress, given his proven developmental status.  The
> records also reflect that BD displayed no signs or symptoms of stress outwardly, which**

**more likely than not would have been present were he experiencing stress as a result of the absence of these items.**

(Def. Ex. 23 at 22) (emphasis added).  Where, as here, the expert's statement "does not provide with any reasonable degree of specificity the basis and reasons for her opinions, [or] the facts or data underlying her opinions" the report is insufficient to defeat a motion for summary judgment.  See Kerlinsky, 783 F. Supp. 2d at 242 (and cases cited).

Even more problematic is the fact that Dr. Ming describes B.D.'s alleged regression as one continuum from the seizures to B.D.'s transfer to a residential facility, where he continues to reside to the present.  Even assuming that there is evidence of such a level of regression (which is not reflected in facts presented to the court),[22] this continuous exacerbation of B.D.'s behavioral disorders is not consistent with the record.  In his contemporaneous reports dated June 30, 2013 and March 28, 2014, Dr. Thibert found that B.D. was "doing well" and was "less anxious" since he left GPS.  (Def. Ex. 24 at 33, 37).  In her report on November 24, 2014, Dr. Morgan found that "[r]elative to [B.D.'s] presentation on the prior evaluation (in 2012), there was some improvement on cognitive tasks and qualitatively improvements in attention, behavior regulation and language formulation/organization were also evident."  (Pl. Ex. 29 at 3). An expert opinion based on "incorrect factual assumptions" is insufficient to create a triable

---

[22] Such a dramatic level of regression following the seizures is also inconsistent with the care shown by the Doucettes for B.D., or by Dr. Thibert, all of whom agreed to send B.D. back to Perley in September 2012.

issue of fact.  Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005) (cited by Borges ex rel.

S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 8 (1st Cir. 2010)).

The most disturbing aspect of Dr. Ming's report, however, is that she ignores the fact

that B.D. left GPS in September 2012, and that he attended a different school for two years and

then suffered a psychotic episode requiring hospitalization, all before he was placed in a

residential school.  Without any account for significant events and obvious potential alternative

explanation for B.D.'s needing a residential placement, this court is unable to determine that

Dr. Ming "arrived at [her] conclusions using scientific methods and procedures, and that those

conclusions were not subjective beliefs or unsupported speculation."  Claar v. Burlington

Northern R. Co., 29 F.3d 499, 502 (9th Cir. 1994).  There is "simply too great an analytical gap

between the data and the opinion proffered" to credit Dr. Ming's opinion.  McGovern ex rel.

McGovern, 584 F. Supp. 2d at 426 (citing General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.

Ct. 512, 139 L. Ed. 2d 508 (1997)).  Consequently, Dr. Ming's opinion is insufficient to establish

that the defendants' behavior caused B.D.'s seizures, or that the seizures resulted in lasting

harm.  See Williams v. Kawasaki Motors Corp., U.S.A., 30 F.4th 66, 71-72 (1st Cir. 2022) (where

proffered expert testimony failed to establish causation because it did not address critical facts,

summary judgment for defendants affirmed).[23]  See also Rodriguez-Cirilo v. Garcia, 115 F.3d 50,

---

[23] "A court evaluating medical expert opinion testimony may [also] consider whether there is contrary, credible expert opinion, . . . and whether the proffered opinion is one that physicians themselves would accept as useful and reliable[.]"  McGovern ex rel. McGovern, 584 F. Supp. 2d at 424 (internal citations omitted).  The reports of Dr. Cvejic and Dr. Dodyk who reviewed the facts in detail, consider relevant events and explain their findings in detail stand in sharp contrast to Dr. Ming's report.  (See Def. Ex. 23, 22).

52 (1st Cir. 1997) ("The remoteness in time of the harm in this case precludes a finding of proximate causation.").

**The Decision to Return B.D. to GPS**

Finally,[24] the plaintiffs argue that Ms. Straight's email of September 5, 2012 in which she reviewed the agreed upon plan to go forward, and stated that "any extended absences would be considered truancy" raises a question of fact and is "evidence of an underlying malicious intent[.]" (Pl. Rev. Opp. at 13). This argument is unpersuasive. On or about August 30, 2012, prior to the start of the regular Perley school year, the Doucettes met with School personnel to discuss the upcoming year. (Def. Ex. 12 at 67). Dr. Thibert participated in the discussions. (See id.; PR ¶ 80; Def. Ex. 9 at 143-44). The parties agreed to having B.D. returned to Perley, and GPS agreed to have the Perley program reviewed by outside professionals. (Def. Ex. 12 at 67). In light of the fact that the Doucettes had withdrawn B.D. prematurely from school in 2010 (according to the Hearing Officer) and had again withdrawn B.D. unilaterally from the ESY program, Ms. Straight wanted to caution the Doucettes against pulling B.D. out of school again. While perhaps inartfully phrased, the email, which includes an agreement to have outside

---

[24] The court has not attempted to address all of the plaintiffs' objections to the services provided, and recognizes that certain objections are fully supported by the record – such as the failure of the defendants to have a school nurse on a trip. (DF ¶ 56). They have all been considered by the court. Nevertheless, this court concludes that none of the failures, individually or collectively, were sufficient to "shock the conscience" or to support a conclusion of callous disregard to B.D.'s well-being. See Doe v. Dennis-Yarmouth Reg. Sch. Dist., 2022 WL 36480, at *5 (Section 1983 claim dismissed even "[t]aking as true that Dennis-Yarmouth was on notice of inadequate staffing" which resulted in a disabled student who required constant supervision being left alone. Conduct did not rise to the level of a constitutional violation).

personnel make suggestions to improve GPS's program, does not constitute behavior that "shocks the conscience."

After B.D. returned to school on September 5, 2012, B.D. suffered another seizure. (DF ¶ 91). B.D. was taken out of school by his parents. In her interview with DCF on September 19, 2012, after charging the school with abuse and neglect for failing to respond to the seizure quickly enough, Ms. Doucette acknowledged that it was "difficult to pinpoint the stress triggers" and stated that it must be "something about the school or the program [that] is causing [B.D.] anxiety and bringing on the emergent seizures." (Pl. Ex. 38 at 2).[25] The defendants' actions in trying to implement B.D.'s IEP without any apparent stress triggers cannot be deemed to have "shocked the conscience" or constitute deliberate indifference to B.D.'s well-being.

Following this seizure in September, B.D.'s doctors, and a consultant retained by the Doucettes, Naomi Chedd, recommended that B.D. be put in a different setting. (See, e.g., Def. Ex. 24 at 29 ¶¶ 2, 5).[26] Specifically, Ms. Chedd opined in part as follows:

> It is my opinion, based on [B.D.]'s complex medical, cognitive and social/emotional profile, he would be appropriately served in a small, specialized classroom made up of students with similar challenges, learning at the same pace and working on similar goals. He learns and behaves best in a consistent, predictable environment with few

---

[25] According to the plaintiffs, when Ms. Maher was interviewed by DCF on October 1, 2012, in connection with this complaint, "Ms Maher is quoted as having complained that B.D. had a 'Cadillac' I.E.P. when the law only called for a 'Chevrolet.'" (Pl. Rev. Opp. at 12, citing Pl. Ex. 38). Assuming this statement was made, it cannot be viewed as evidence of callous disregard for B.D.'s well-being since a fair reading of the summary of the interview shows the defendants' concern for B.D.'s well-being and their efforts to meet his needs and the Doucettes' concerns: they did not object to providing the services required by the IEP. Moreover, like any other "stray remarks," even if this statement is read as a negative comment, it is insufficient to prove discriminatory intent. See Paul, 948 F.3d at 54.

[26] None of these reports indicate that the doctors conducted any analysis to determine the cause of B.D.'s seizures, again just repeating the conclusory complaints of the Doucettes.

transitions, and a minimum of auditory and visual stimuli.  A large, fast-pace public
school setting is not a good match for him at this time.

In addition, as [B.D.] has repeatedly experienced seizures and subsequent trips to the
hospital, he relates these very traumatic episodes to his public school setting.  It would
be in his best interests to help him understand and work through the anxiety and
trauma associated with those episodes, but not in the setting in which they occurred,
certainly not at this time.  As [B.D.] learns coping skills and slowly comes to understand
those events in a developmentally and cognitively appropriate way, he may be able to
visit the school again.  But it is my opinion that it would not be helpful, and it could be
harmful to him to visit now.

(Pl. Ex. 35 at 3).[27]  While the procedures followed to have B.D. placed out-of-district are not

developed in the record, the plaintiffs are not arguing that the defendants responded to the

September request inappropriately.  Thus, there is nothing in the events relating to either B.D.'s

return to school in September 2012, which was agreed to by the Doucettes as well as B.D.'s

doctor, or the decision to grant an out-of-district placement, that shocks the conscience or

would support a finding of a constitutional violation.

For all these reasons, summary judgment shall enter in favor of the defendants on the

plaintiffs' claim pursuant to 42 U.S.C. § 1983.

**D.  Section 504 of the Rehabilitation Act of 1973**

Section 504 of the Rehabilitation Act of 1973 provides in relevant part:

No otherwise qualified individual with a disability . . . shall, solely by reason of her or his
disability, be excluded from the participation in, be denied the benefits of, or be
subjected to discrimination under any program or activity receiving Federal financial
assistance . . . .

29 U.S.C. § 794(a).  "An individual with a disability is excluded from, denied the benefits of, or

otherwise subjected to discrimination under a program 'solely by reason of . . . his disability' if:

---

[27] Ms. Chedd further offered some medical opinions: however there is nothing in the record to indicate
that Ms. Chedd has the qualifications to offer such opinions.  (See Pl. Ex. 35 at 4).

(1) there is a 'causal connection' between his disability and the discriminatory action; and (2) his disability was 'the only cause' of the discriminatory action."  Shaikh v. Texas A&M University College of Medicine, 739 Fed. App'x 215, 222 (5th Cir. 2018) (quoting Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994) (additional citations omitted)).  "To prevail on a discrimination claim under the Rehabilitation Act . . . involving a denial of a FAPE," a plaintiff must show that he "has a qualifying disability and has been denied a FAPE" and, in addition, "that the denial resulted from a disability-based animus."  D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 40 (1st Cir. 2012).  For the reasons detailed more fully above, the plaintiffs have failed to establish that B.D. was denied a FAPE or that the defendants acted with discriminatory animus.

The plaintiffs have waived their claim that the defendants' failure to allow B.D. to attend school with his service dog as an accommodation provided by the defendants deprived him of a FAPE.  See note 6, supra.  Rather, they now contend that the defendants' failure to comply generally with the requirements of B.D.'s IEP that were "designed to prevent emotional dysregulation, to decrease anxiety and stress, and to keep B.D. calm" violated the Rehabilitation Act.  (Pl. Rev. Opp. at 15).  In this court's view, this argument that B.D. was denied a FAPE is barred by the failure to exhaust administrative remedies.  See Doucette, 936 F.3d at 24-25 (The Doucettes' section 504 claim based on denial of a service dog can proceed without exhausting administrative remedies because it "involves the denial of non-discriminatory access to a public institution, irrespective of the school district's FAPE obligation to provide a particular education program for B.D.").  However, the defendants have not raised this argument, and the defendants are entitled to summary judgment for the additional reasons that the plaintiffs have failed to establish either non-compliance with the IEP (as

discussed above) or that B.D. was denied a FAPE.  All of the reports of B.D.'s doctors, including

Dr. Thibert, establish that B.D. was making progress.  See Endrew F., 137 S. Ct. at 999 ("Any

review of an IEP must appreciate that the question is whether the IEP is reasonable, not

whether the court regards it as ideal.  The IEP must aim to enable the child to make progress.").

The uncontested facts establish that B.D. received substantial services both during the school

year and during the ESY, even if not to the plaintiffs' satisfaction.  The test for whether an IEP

has been implemented has been described as "(1) the 'failure' to implement must not be a

'complete' failure; (2) the variance from the special education and related services specified in

the IEP must not deprive the student of a FAPE; and (3) the provision of special education and

related services must make 'progress' toward the achievement of the goals stated in the IEP."

Doe v. Hampden-Wilbraham Reg'l Sch. Dist., 715 F. Supp. 2d at 198  (citations omitted).

Moreover, to prevail on a challenge to the implementation of an IEP, there must be "more than

a de minimis failure to implement all elements of that IEP," rather the plaintiff "must

demonstrate that the school board or other authorities failed to implement substantial or

significant provisions of the IEP."  Colón-Vazquez, 46 F. Supp. 3d at 143  (quotation omitted).

No such showing has been made here.  Finally, even if the court were to find a denial of the

FAPE (which it does not), the claim under the Rehabilitation Act must fail as there is no

evidence that the defendants acted with discriminatory animus.  See D.B. ex rel. Elizabeth B.,

675 F.3d at 40 (and cases cited).  Therefore, summary judgment shall enter in favor of the defendants on this claim as well.

**E.  <u>State Law Claims</u>**

The remaining state law claims are for intentional infliction of emotional distress against the individual defendants (Count I), negligence pursuant to Mass. Gen. Laws ch. 258, § 2 against GPS, GSC and the Town (Count II), loss of consortium pursuant to Mass. Gen. Laws ch. 231, § 85X against all defendants (Count III), and negligent infliction of emotional distress against GPS, GSC and the Town (Count VI).  These claims must fail as well.

**<u>Intentional Infliction of Emotional Distress</u>**

"To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress."  <u>Doe v. D'Agostino</u>, 367 F. Supp. 2d 157, 173 (D. Mass. 2005) (quotation omitted).  "The extreme and outrageous conduct must be beyond all bounds of decency and utterly intolerable in a civilized community."  <u>Id.</u> (internal quotation and punctuation omitted).  Without belaboring the point, for the reasons detailed above the plaintiffs have failed to establish that the defendants engaged in any such egregious behavior.

**<u>Negligence Claims</u>**

Plaintiffs contend that the defendants breached their duty to provide B.D. with a FAPE "by failing to comply with B.D.'s I.E.P. through their negligent actions and omissions" and that "[t]hese breaches caused B.D. to suffer five life-threatening seizures and to suffer severe

regression." (Pl. Rev. Opp. at 16). Thus, the plaintiffs argue, it is for the jury to decide if the defendants' failure to comply with B.D.'s IEP "created safety risks to B.D. and caused B.D. to suffer and sustain severe and life-threatening injuries" and "whether the defendants' actions and omissions were negligent and caused B.D. to suffer severe and life-threatening injuries." (Id.). These arguments must fail. As detailed above, the plaintiffs have failed to establish that the defendants did not comply with B.D.'s IEP, or that B.D. was deprived of a FAPE. Moreover, the plaintiffs have failed to put forth credible medical evidence to establish the causal link between the defendants' conduct and B.D.'s seizures. See Burke v. McDonald, 572 F.3d 51, 60 (1st Cir. 2009) (common law tort principles of causation apply to § 1983 cases). Therefore, summary judgment shall enter in the defendants' favor on the negligence claims (Counts II & IV).[28]

### Loss of Consortium

Plaintiffs' final count is for loss of consortium against all defendants pursuant to Mass. Gen. Laws ch. 231, § 85X, which provides that the "parents of a minor child . . who is dependent on his parents for support shall have a cause of action for loss of consortium of the child who has been seriously injured against any person who is legally responsible for causing such injury." "Consortium claims are derivative in nature, so they require an underlying tortious act." Doe v. Dennis-Yarmouth Regional Sch. Dist., 2022 WL 36480, at *10 (internal punctuation and citation omitted). Since the plaintiffs underlying claims have been dismissed, the consortium claim must fail as well. Id. Moreover, the statute does not allow recovery

---

[28] In light of this ruling the court declines to address the other arguments raised by the defendants, including, without limitation, qualified immunity and statute of limitations defenses.

against municipal defendants.  Id. (and cases cited).  Consequently, the defendants are entitled

to summary judgment on this claim as well.

### IV.  **CONCLUSION**

For all the reasons detailed herein, defendants' motion for summary judgment (Docket

No. 117) is ALLOWED.

    / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[61]